Docket No. 97544.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT STECHLY, Appellant.

*Opinion filed April 19, 2007.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices Fitzgerald and Burke concurred in the judgment and opinion.

Justice Kilbride concurred in part and dissented in part, with opinion.

Chief Justice Thomas dissented, with opinion, joined by Justice Karmeier.

Justice Garman dissented, with opinion.

## OPINION

Following a stipulated bench trial in the circuit court of Cook County, defendant Robert Stechly was convicted of predatory criminal sexual assault of a child (720 ILCS 5/12–14.1(a)(1) (West 1998)), criminal sexual assault (720 ILCS 5/12–13(a)(1), (a)(2) (West 1998)), and aggravated criminal sexual abuse (720 ILCS 5/12–16(c)(1)(i) (West 1998)). Defendant's convictions arose from an incident in December 1998 involving M.M., the five-year-old

daughter of defendant's girlfriend. As a result of the convictions, the circuit court sentenced defendant to six years' imprisonment. Defendant appealed, arguing that the circuit court erred in admitting the child's statements pursuant to the hearsay exception for sexual abuse victims under the age of 13 (725 ILCS 5/115–10 (West 1998)), and in concluding that the child was unavailable to testify at trial. The appellate court affirmed (No. 1–01–2869 (unpublished order under Supreme Court Rule 23)), and defendant petitioned for leave to appeal to this court. Subsequently, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which held that the testimonial hearsay statements of a witness who is absent from trial may not be admitted against a criminal defendant unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Defendant filed a supplemental petition for leave to appeal in which he cited *Crawford*. We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315.

BACKGROUND

In 1999, defendant was indicted on charges of predatory criminal sexual assault of a child (720 ILCS 5/12–14.1(a)(1) (West 1998)), criminal sexual assault (720 ILCS 5/12–13(a)(1), (a)(2) (West 1998)), and aggravated criminal sexual abuse (720 ILCS 5/12–16(c)(1)(i) (West 1998)). According to the indictment, the charges stemmed from an incident that occurred on or about December 20, 1998.

Prior to trial, the State requested a hearing to determine whether the victim's hearsay statements were sufficiently reliable to be admitted under section 115–10 of the Code of Criminal Procedure. At this hearing, the State offered the testimony of three recipients of the child's hearsay statements. Joan G., the child's mother, testified that, on January 13, 1999, M.M.'s babysitter, Brenda Galete, came to Joan's place of employment and told Joan that they needed to take the child to the hospital. Brenda did not tell Joan what happened, and Joan did not know why they were going to the hospital. Joan went with Brenda, and sat next to M.M. in the backseat of Brenda's car. During the ride to the hospital, Joan asked M.M. what was wrong, and M.M. described an incident of sexual abuse by "Bob." M.M. also said "Bob" warned her that if she told her mother about the abuse, he

-2-

would "hurt" M.M. Joan understood "Bob" to be defendant, who at the time lived in Joan's apartment building in Alsip, Illinois, and was involved with Joan in a relationship. According to Joan, on a Monday about two weeks before Christmas 1998, defendant babysat M.M. in his apartment while Joan was at work. Subsequently, Joan noticed that her daughter was "acting awful strange" and "acting peculiar." For example, around Christmastime, when Joan suggested that she and M.M. go to defendant's apartment to visit, M.M. "got very upset" and said she did not want to go there. Joan suspected that either defendant or the child's father had done something sexual to M.M. About December 21, 1998, Joan confronted defendant with her suspicions, but he denied doing anything to M.M.

Upon arriving at Christ Hospital, Joan and M.M. went to the emergency room. While they were there, Ann Grote, a clinical specialist in charge of the hospital's child-abuse team, came to the emergency room and spoke with Joan. Grote, a registered nurse, testified at the reliability hearing that, following her conversation with Joan, she decided to interview M.M. According to Grote, the child's mother told her that the perpetrator was "the babysitter," a man with whom Joan was involved in a relationship. Grote took M.M. to her office in Hope Children's Hospital, which adjoined Christ Hospital, and interviewed the child in a playroom that was connected to Grote's office. Grote testified that the child described an incident of sexual abuse by "Bob." The details were essentially the same as those recounted by Joan in her testimony. According to Grote, M.M. said "Bob" told her not to tell about the abuse, and he warned M.M. that he "would be mad" if she told her mother. After the interview, Grote returned M.M. to the emergency room for an examination. Grote also spoke to Joan, telling her that a report would be filed and that Grote would contact the police department and would verify that the Illinois Department of Children and Family Services (DCFS) had been notified.

Grote testified further that the next day, January 14, 1999, she spoke to Investigator Michael Fogarty of the Alsip police department and arranged for a second interview with M.M. at about 3 p.m. that day. The interview took place in the same playroom, which was equipped with a microphone and was connected to a second room by a one-way mirror. In the second room were Investigator Fogarty and

an assistant State's Attorney. Grote began the interview with M.M. by asking the child if she could remember why she had come to the hospital the previous day. M.M. answered that "it was because of what Bob had done to her." According to Grote, M.M. then related essentially the same incident that she had described the day before.

Also testifying at the reliability hearing was Perry Yates, a social worker at the school where M.M. attended kindergarten. At about 8:30 a.m. on January 14, 1999–the date of Grote's second interview with M.M.–Yates received a telephone call at his office from M.M.'s mother, who gave him "some information." Yates then asked Joan if he could speak to M.M. individually, and Joan said "that would be fine." In his testimony at the hearing, Yates explained his reason for asking to speak with M.M. "The information that the mother had disclosed put me in a position where I had to make a mandated report [to DCFS]." Yates had a "legal obligation to check it out." Yates began the interview with M.M. by asking her what she could tell him about Robert Stechly. M.M. responded by describing an incident of sexual abuse, the details of which were similar to those recounted by Joan and Grote. Yates stated:

> "It was kind of a long rambling narrative[,] which is unusual for the age of the child. She was very coherent, she gave a very comprehensive step by step report to me that was fairly alarming."

With regard to when the alleged incident occurred, M.M. told Yates that it happened "before Santa Claus came." On cross-examination, Yates conceded that, while he had mentioned the name "Robert Stechly" in his initial question to M.M., she did not mention defendant by name during the interview.

At the conclusion of the hearing, the circuit court found that "the time, content, and circumstances" of the hearsay statements "provide sufficient safeguards of reliability to be admissible." Pursuant to section 115–10(b)(2), the court held that the statements "shall be admissible contingent upon one of two things occurring: [e]ither the child testifying at trial, or a judicial determination of unavailability, and there is corroborative evidence of the act" that was the subject of the statements.

The State filed a motion *in limine* seeking a judicial determination regarding the victim's availability to testify. The sole witness at the hearing on this motion was Nancy Machonkin, a clinical child psychologist. Machonkin testified that she was hired by the victim's father in March 1999 to evaluate M.M. to determine what impact the alleged abuse had on the child and the type of treatment M.M. might need. Machonkin met with M.M. five times over a monthlong period in the spring of 1999 and, after these five sessions, concluded that there was no need for treatment. Machonkin met with M.M. again in October 2000, this time in anticipation of M.M.'s possibly testifying. M.M.'s father told Machonkin that there was a possibility that the State might require M.M. to testify, and he wanted Machonkin to determine what impact that might have on the child. In her testimony at the availability hearing, Machonkin stated that in all the sessions she had with M.M., Machonkin was never able to persuade M.M. to talk about the sexual abuse allegations. In the spring 1999 sessions, each time Machonkin tried to broach the alleged abuse, M.M. would state: "I don't want to tell. I don't want to talk about it. I'm not going to talk about it." M.M. gave a similar response in the October 2000 session when Machonkin suggested the possibility of testifying in court regarding the alleged abuse. M.M. stated: "It's nasty. I'm scared. I don't want to tell. I don't want to talk about it."

Machonkin testified further that, if M.M. were forced to testify, she would likely experience trauma symptoms such as anxiety, sleep disturbance, and difficulties in concentrating and paying attention. According to Machonkin, it would not be in the child's best interest to testify. Machonkin stated that, in her professional opinion, M.M. was unavailable to testify. On cross-examination, Machonkin acknowledged that there were steps the court might take to minimize the stress associated with testifying. For example, M.M. could (1) visit the courtroom when it was empty, (2) talk to the judge in chambers, or (3) meet beforehand with the persons who would be asking the questions. While Machonkin indicated that it might take a year or more for M.M. to become acclimated to the courtroom, and even then there would be no guarantees, Machonkin also stated that M.M. might possibly become acclimated to the courtroom in as little as two weeks.

At the conclusion of the availability hearing, the circuit court declared M.M. legally unavailable. The court noted that M.M. had been "repeatedly interviewed by an experienced and seasoned child psychologist" and that M.M. had "steadfastly refused to discuss the incident in question with this child psychologist." The court concluded:

> "[T]his uncommunicative child would likely suffer significant emotional harm if she were to participate in this trial. Such participation would inject [*sic*] this child to fear and anxiety to a degree that would further traumatize her. Accordingly, the Court declares this child to be legally unavailable for trial."

Defendant filed a motion to reconsider the ruling declaring M.M. unavailable to testify. The circuit court denied the motion.

Prior to the stipulated bench trial, defendant's case was tried before a jury. Four of the witnesses for the State at the jury trial were the same witnesses who had testified at the reliability and availability hearings. Their testimony before the jury was essentially consistent with their testimony at the pretrial hearings. However, some additional information was provided in the trial testimony. M.M.'s mother, Joan, stated that, as far as she could recall, defendant babysat M.M. only once. Joan also testified that, in addition to questioning defendant in December 1998 about whether he had sexually abused M.M., Joan asked M.M. (sometime in December before Christmas) if her father or anyone else had ever touched her inappropriately. M.M. said no one had. Joan testified that her nephew, Bob Reilly, lived in an apartment in Joan's building, but Joan insisted that her nephew did not babysit for M.M. In addition, Joan's testimony at trial differed slightly from her testimony at the reliability hearing regarding the conversation with M.M. en route to the hospital. Whereas at the pretrial hearing Joan testified that M.M. identified her abuser as "Bob," and she "understood that to be Bob Stechly," at trial Joan testified that M.M. actually told her that "Robert Stechly" performed the actions in question, identifying defendant by his full first and last names. Ann Grote, the specialist in charge of the hospital's child-abuse team, stated that, with regard to her second interview with M.M., Officer Christopher Radz of the Alsip police department was also in the room adjacent to the playroom, along with

Officer Fogarty and an assistant State's Attorney. Perry Yates, the social worker at M.M.'s school, gave additional details about the telephone call he received from M.M.'s mother the morning of January 14, 1999. According to Yates, the information that M.M.'s mother gave him that morning was that there were allegations that M.M. had been sexually abused and that defendant had "touched" M.M. or "done something" to her. Nancy Machonkin, the clinical child psychologist, explained why, after meeting with M.M. five times in spring 1999, Machonkin concluded that no treatment was necessary. Prior to the sessions with Machonkin, M.M. had exhibited "symptoms" including sexualized behavior, undressing and dressing dolls, and kissing and hugging unfamiliar adults. However, M.M.'s father and grandmother told Machonkin that, following the spring 1999 sessions with Machonkin, M.M. had ceased to exhibit such symptoms. Machonkin also testified that, while M.M. appeared to have moved past the alleged abuse, at least for the time being, the child also was dealing with a new living situation. M.M.'s father had recently obtained temporary legal and physical custody of M.M., and the child was "dealing with transitioning, adjusting [to] living with her father and grandmother full time."

Also testifying for the State at the jury trial were Officer Christopher Radz of the Alsip police department and Kent Delgado, a Cook County assistant State's Attorney. Radz stated that, as part of his investigation of the alleged sexual abuse of M.M., he had observed a "victim sensitive interview" of the child on January 14, 1999, at Hope Children's Hospital. (This was Grote's second interview with M.M.) Radz explained that he and Investigator Fogarty and an assistant State's Attorney were situated behind a one-way mirror while the child sat on the floor of a playroom and spoke to Grote. Radz was able to watch and listen to the interview. That evening, Radz and some other officers found defendant at a pizza parlor where defendant worked part-time. Radz arrested defendant and transported him to the Alsip police station, arriving there shortly after 7 p.m. Defendant was informed of his *Miranda* rights, and he signed a *Miranda* rights waiver form.

Delgado, the assistant State's Attorney, testified that he arrived at the Alsip police station at about 8:30 or 8:45 p.m. on January 14, 1999. At about 11 p.m., after discussing the case with officers and

investigators, and after reading their reports, Delgado spoke to defendant. According to Delgado, defendant told Delgado about the incident, and agreed to put his statement in writing. At the jury trial, Delgado read defendant's statement, in which defendant admitted to the abuse. However, according to defendant's statement, he was asleep when the abuse occurred and mistakenly thought M.M. was Joan. When he realized it was M.M. and not Joan, defendant ended the incident. He told M.M. that it was an accident and told her not to tell anyone because if her mother found out, she would be mad at M.M.

The main witness for the defense at the jury trial was Brenda Galete, the babysitter who had insisted, on January 13, 1999, that M.M. be taken to the hospital. Galete testified that she began babysitting for M.M. in November 1998 (prior to defendant's babysitting for M.M. in December 1998). At that time, Galete noticed that M.M. was "very afraid of men," she was "always fidgety," and she would never leave Galete's side. M.M. also acted "very strange around her mother." Galete testified that she babysat for M.M. "at least a couple [of] times a week," and that Joan had other people babysitting as well. Galete stated, contrary to Joan's testimony, that Joan's nephew, Bob Reilly, who lived in Joan's apartment building, "babysat a lot" for M.M.

Galete testified further that, three or four days before January 13, 1999, the day when M.M. went to the hospital, Galete mentioned to Joan that M.M. was "acting strange" and that Galete thought there had been "some kind of sexual abuse." On January 13, M.M. told Galete about the incident of sexual abuse by "Bob." According to Galete, M.M. "never really specified which Bob." In her testimony at the jury trial, Galete stated: "There are too many Bobs babysitting." Galete was the first person M.M. told about the incident. As a result of her conversation with M.M., Galete went to Joan's place of employment and insisted that they take M.M. to the hospital. Galete stated that, while they were in the car en route to the hospital, Galete did not remember hearing Joan ask M.M. what happened. According to Galete, if Joan asked M.M. questions while they were in the car, Galete did not hear what Joan was asking. This testimony differed from that of Joan, who stated that she did discuss the incident with M.M. while they were in the car. On cross-examination, Galete stated

that she thought "there [were] other people that molested" M.M. Galete told the police that she thought Joan was molesting M.M.

The defense also called two expert witnesses, a clinical psychologist and a psychiatrist. In addition, defendant testified in his own behalf. Robert Shapiro, the clinical psychologist, was sharply critical of the interviewing techniques used by Grote and Yates. In Shapiro's view, Grote should have asked more questions to determine the identity of "Bob." According to Shapiro, Grote obtained enough information from M.M. to conclude that the child had been sexually abused "by someone," but the information was "totally inadequate to determine who did the abuse." Shapiro also testified that, in his opinion, Yates' interview with M.M. was not reliable. Shapiro noted that Yates used defendant's name, "Robert Stechly," in his opening question to M.M. According to Shapiro, this question was improperly leading. Shapiro stated: "You're already throwing out a name. It's leading to the child."

Gregory Teas, the psychiatrist, testified that defendant had difficulties with abstract thinking and did not understand the ramifications of signing a statement. Teas also asserted that, in the 45 hours prior to defendant's signing the statement at the Alsip police station, defendant had gotten only one to three hours of sleep. In Teas' view, this sleep deprivation, coupled with defendant's lack of mental appreciation of the circumstances, played a role in defendant's decisionmaking the night he signed the statement. Defendant's main interest at the time he signed the statement, Teas asserted, was in going home. "[H]e trusted the authorities[;] he felt that he did nothing wrong." According to Teas, defendant signed what he considered to be a false statement because "he thought it was a fair thing to do to get some sleep and so that the truth could come out the next day, through further investigation."

In his testimony at the jury trial, defendant acknowledged that he babysat for M.M. on one occasion, approximately the first Monday in December 1998, but he denied that any sexual abuse took place. Defendant denied touching M.M. on that or any other date. He also denied having M.M. touch him in any inappropriate place. With regard to the interrogation at the Alsip police station on the night of January 13, 1999, defendant testified that he denied committing the offense. However, by the time Assistant State's Attorney Delgado

began questioning him, defendant said he was getting tired of telling the authorities that he "didn't do it" and "trying to prove himself." Defendant told Delgado and Fogarty: "[I]f this is what you guys think happened, I don't care, write it down if you want to." Defendant signed the statement, even though he knew it was not true.

Following the presentation of evidence, the jury was instructed and began deliberations. The jury subsequently sent a note to the judge stating: "Split on all counts." The judge asked each of the jurors the following question: "In your considered opinion, could further deliberations possibly result in a verdict?" Each juror answered "no." The judge declared a mistrial.

Defendant waived his right to a second jury trial, and requested a bench trial instead. The parties then stipulated that, if they were to call witnesses at the bench trial, they would call the same witnesses who testified at the jury trial, and their testimony would be the same as it was at the jury trial. The judge stated that he "well remember[ed]" the facts of the case and the testimony of each witness. He added that he had taken "copious notes during the course of the jury trial" and had reviewed those notes. The judge found defendant guilty on all counts.

Defendant moved for a new trial, arguing that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt, and (2) the court erred in (a) declaring the victim unavailable for trial and (b) allowing Ann Grote, Perry Yates, and Joan G. to testify as to the victim's hearsay statements. According to defendant, the hearsay testimony of these three witnesses was neither reliable nor credible evidence. The motion for a new trial was denied. The court sentenced defendant to six years in prison.

On appeal, defendant raised two arguments. First, he contended that the trial court erred in admitting M.M.'s hearsay statements. According to defendant, the State failed to meet its statutory burden of showing that the hearsay statements were reliable. See 725 ILCS 5/115–10 (West 1998). Defendant noted that the State failed to call Brenda Galete, the babysitter who was the initial outcry witness, to testify at the reliability hearing. In defendant's view, Galete's testimony "was critical to showing all the circumstances that led to the subsequent [hearsay] statements and for determining their reliability."

Defendant also argued that the trial court erred in declaring M.M. unavailable to testify. According to defendant, the testimony of psychologist Nancy Machonkin, the sole witness at the unavailability hearing, was insufficient to establish that M.M. was unable to testify at trial.

The appellate court affirmed the judgment of the circuit court. No. 1–01–2869 (unpublished order under Supreme Court Rule 23). With regard to defendant's argument that the State should have called Galete, the initial outcry witness, to testify at the reliability hearing, the appellate court stated: "The outcry witness, to whom the child victim first reports the sexual assault, is not required to testify in order for the child's statements to be deemed reliable." No. 1–01–2869 (unpublished order under Supreme Court Rule 23).

The appellate court also rejected defendant's unavailability argument. The court concluded, contrary to defendant's contention, that Machonkin's testimony was sufficient to show that M.M. was unavailable to testify. The appellate court held: "[T]he trial court did not abuse its discretion in determining, on the evidence presented, that M.M. was legally unavailable for trial."

DISCUSSION

Before this court, defendant renews the reliability and availability arguments that he advanced in the appellate court below. Defendant contends that the State failed to meet its burden of establishing the reliability of M.M.'s hearsay statements, and the circuit court therefore erred in admitting these statements. Defendant also argues that the circuit court erred in declaring M.M. unavailable to testify. The State responds that the circuit court was well within its discretion in finding the statements reliable and finding M.M. unavailable to testify, and urges that we affirm the circuit court's rulings on these issues.

In addition, defendant advances an alternative argument that was not presented to the appellate court. Defendant now contends that the admission of M.M.'s hearsay statements violated his sixth amendment right to confront the witnesses against him, and therefore these statements should not have been admitted. He bases his argument on the Supreme Court's decision in *Crawford v.*

*Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which was decided after the appellate court rendered its decision in this case. There, the Supreme Court held that the "testimonial" hearsay statements of a witness who does not testify at trial are inadmissible against a criminal defendant unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. In the case at bar, defendant argues that M.M.'s statements were testimonial hearsay as contemplated in *Crawford*. Defendant contends that, because he had no opportunity to cross-examine M.M., the admission of her statements violated the confrontation clause under *Crawford*.

The State raises a host of counterarguments to defendant's *Crawford*-based confrontation clause claim. The State contends initially that we ought not even consider the argument, for two reasons: defendant waived the argument by failing to raise it below, and defendant forfeited the protection of the confrontation clause because his conduct was responsible for M.M.'s unavailability for trial. On the merits of the confrontation clause claim, the State argues that the statements made by M.M. were not "testimonial" and thus did not trigger the confrontation clause's protection, because M.M. was not aware that her statements could be used in future prosecution and because none of the statements were made directly to representatives of law enforcement. Finally, the State argues that any confrontation clause violation which we may find to have occurred was in any event harmless.

As a general rule courts avoid deciding constitutional questions when other, nonconstitutional grounds exist for resolving the case. See, *e.g.*, *People v. Lee*, 214 Ill. 2d 476, 482 (2005); *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004), quoting *In re S.G.*, 175 Ill. 2d 471, 479 (1997). Thus we ordinarily first would turn to defendant's arguments regarding reliability and availability, before addressing *Crawford* and the confrontation clause. However, as the State notes, defendant's reliability and availability arguments are both couched in constitutional terms. Moreover, the far-reaching changes *Crawford* and its progeny have wrought to confrontation clause analysis may well impact our consideration of these other issues as well. Accordingly, we believe the most efficient route will be to turn first to defendant's new argument: that introduction of M.M.'s statements

to her mother, Grote, and Yates violated his rights under the confrontation clause.


I. Defendant's Confrontation Clause Claim

A. Introduction

The sixth amendment to the United States Constitution, which was adopted in 1791, provides that

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const., amend. VI.

That portion of the sixth amendment which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him" is known as the confrontation clause. This right extends to the states through the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 406, 13 L. Ed. 2d 923, 927-28, 85 S. Ct. 1065, 1069 (1965). See also Ill. Const. 1970, art. I, §8 (amended 1994) ("In criminal prosecutions, the accused shall have the right *** to be confronted with the witnesses against him or her").

In 1980, the United States Supreme Court established a general framework for confrontation clause analysis in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). There, the Court held that

> "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at

-13-

least absent a showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539.

The *Roberts* framework for confrontation clause analysis lasted for nearly two decades, and section 115–10 of our Code of Criminal Procedure of 1963 was tailored to suit the constitutional requirements therein delineated. See 725 ILCS 5/115–10 (West 2000).

## B. *Crawford* and *Davis*

However, in 2004 the Supreme Court fundamentally altered its approach to confrontation clause analysis. In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Court considered the appeal of a criminal defendant who was convicted based in part on statements his wife made during an interview while in police custody. The defendant's wife did not testify at trial, because of defendant's invocation of spousal privilege. However, the trial court admitted her out-of-court statements, over defendant's confrontation clause objection, after determining that they bore "particularized guarantees of trustworthiness."

The Court overruled *Roberts* and held that the admission of the statement against defendant violated the confrontation clause. The Court began by revisiting the historical origins of the confrontation clause, noting that it was a reaction against the civil law practice of admitting at trial statements made outside of court, in response to questioning by justices of the peace or other officials. *Crawford*, 541 U.S. at 43-50, 158 L. Ed. 2d at 187-92, 124 S. Ct. at 1359-63. The Court labeled the political trials of the sixteenth and seventeenth centuries the most "notorious" examples of this practice (*Crawford*, 541 U.S. at 44, 158 L. Ed. 2d at 188, 124 S. Ct. at 1360), and specifically noted the trial of Sir Walter Raleigh. There, Lord Cobham, Raleigh's alleged accomplice, accused Raleigh in both an out-of-court examination and a letter, both of which were admitted at Raleigh's trial as evidence against him. The judges rejected Raleigh's pleas for Cobham to be brought to court to testify in person, and the jury convicted Raleigh and sentenced him to death. *Crawford*, 541 U.S. at 44, 158 L. Ed. 2d at 188, 124 S. Ct. at 1360. The Court in

*Crawford* went on to note subsequent reforms in English law, as well as practices in the Colonies.

The Court's historical review led the Court to two conclusions regarding the confrontation clause:

> "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. ***

> * * *

> The historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 50-54, 158 L. Ed. 2d at 192-94, 124 S. Ct. at 1363-65.

These two propositions led the Court to conclude that the protections provided by the *Roberts* framework were insufficient in the context of "testimonial" statements. *Crawford*, 541 U.S. at 61-62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370-71. Rather, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford*, 541 U.S. at 68-69, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. However, the *Crawford* Court explicitly declined to define what exactly makes a statement "testimonial." See *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The Court noted a few possible definitions but rather than attempting a comprehensive definition, simply held that whatever the definition of "testimonial hearsay" might be, "interrogations by law enforcement officers fall squarely within" it. *Crawford*, 541 U.S. at 53, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365. The Court held that the recorded statement at issue in *Crawford*, "knowingly given in response to structured police questioning, qualifies" as having been the product of an interrogation "under any conceivable definition." *Crawford*, 541 U.S. at 53 n.4, 158 L. Ed. 2d at 194 n.4, 124 S. Ct. at 1365 n.4. See also *Crawford*, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364 ("Statements taken by police officers in the course

-15-

of interrogation are also testimonial under even a narrow standard"); *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374 ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," which are "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed").

More recently, the Court returned to the confrontation clause and added to the *Crawford* jurisprudence. In *Davis v. Washington*, 547 U.S. __, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), the Court considered statements from two distinct appeals in which criminal defendants raised confrontation clause challenges to out-of-court statements which had been admitted at their trials. In the first case, the statements were made in the context of an emergency call to a 911 operator. In the second case, the statements were made to police officers at the scene of a domestic altercation, after the altercation had ended. The Court concluded the statements to the officers at the scene of the domestic disturbance were testimonial (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 241-42, 126 S. Ct. at 2278), but the statements to the 911 operator were not (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 240-41, 126 S. Ct. at 2276-77). The differing results were not based on any distinction between police officers and 911 operators *per se*, because the Court assumed for purposes of analysis that 911 operators were agents of law enforcement. *Davis*, 547 U.S. at __ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2. Rather, the Court clarified or modified its holding in *Crawford* to hold that statements to law enforcement officials are not *always* testimonial. The Court held that whether such statements were testimonial depended on the intent–more specifically, objective manifestations of intent–of the police when taking the statement:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

-16-

*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.


## C. The Case at Bar
### 1. *Waiver*

As previously noted, the State argues initially that defendant has waived any confrontation clause claims by not raising them below. We reject this argument. "*Crawford* announced a new rule regarding the effect of the confrontation clause on the admission of hearsay statements in criminal prosecutions." *People v. Sisavath*, 118 Cal. App. 4th 1396, 1400, 13 Cal. Rptr. 3d 753, 756 (2004); see also *People v. Compan*, 100 P.3d 533, 537 (Colo. App. 2004). " 'A new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final.' " *Sisavath*, 118 Cal. App. 4th at 1400, 13 Cal. Rptr. 3d at 756, quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987); *People v. Ford*, 198 Ill. 2d 68, 72-73 (2001). It would be manifestly unfair to hold defendant to have waived claims by not raising them at trial when those claims are based on a rule which was only announced during the pendency of his appeal to this court.


### 2. *Forfeiture by Wrongdoing*

The State argues in the alternative that defendant should not be permitted to raise a confrontation clause claim because he himself is to blame for M.M.'s unavailability. The State's argument is based on the equitable doctrine of forfeiture by wrongdoing. As the Supreme Court stated in *Crawford*, 541 U.S. at 62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370, "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." According to this rule, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. See also *Reynolds v. United States*, 98 U.S. 145, 158, 25 L. Ed. 244, 247 (1879) ("The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against

him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away").

The parties differ on the application of this doctrine. Defendant argues that his confrontation rights are forfeited only if he *intended* to cause the witness to be unavailable for trial. He contends that there is no evidence that he intended to preclude M.M. from testifying against him and, accordingly, he should retain his right to confront her. The State advocates for a broader approach, arguing that the doctrine of forfeiture by wrongdoing accepted by the Court in *Crawford* "does not require an intent to prevent the witness from testifying." The State contends that the doctrine focuses on the defendant's wrongdoing and its *result*, rather than on the defendant's *motive*. The State argues that M.M. is unavailable for trial solely because of defendant's assault and, accordingly, he has forfeited his right to confront her, regardless of whether he had any intent to prevent her from testifying.

Courts are split on the intent requirement. Some courts have held that intent is an element of the doctrine (see, *e.g.*, *People v. Melchor*, 362 Ill. App. 3d 335 (2005), *appeal allowed*, 218 Ill. 2d 551 (2006) (table); *Commonwealth v. Edwards*, 444 Mass. 526, 540, 830 N.E.2d 158, 170 (2005); *State v. Alvarez-Lopez*, 136 N.M. 309, 315, 98 P.3d 699, 705 (2004)), but as the State and the dissent note, the majority of decisions are to the effect that the defendant's intent is not relevant. See *Gonzalez v. State*, 195 S.W.3d 114, 119 n.25 (Tex. Crim. App. 2006), quoting J. Kroger, *The Confrontation Waiver Rule*, 76 B.U.L. Rev. 835, 854, 875-77 (1996).

Depending on one's understanding of the theoretical underpinnings of the rule, support can be found for both views. The doctrine serves the public policy of protecting "the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness." *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). See also *United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002) (noting that "[t]he primary reasoning behind this rule is *** to deter criminals from intimidating or 'taking care of' potential witnesses against them"). When the rule is considered in this light, it makes sense to limit its application to those situations in which the defendant intended to

procure the witness' unavailability. It is, after all, impossible to deter those who do not act intentionally. However, the Supreme Court has stated that the doctrine of forfeiture by wrongdoing is rooted in the equitable "maxim that no one shall be permitted to take advantage of his own wrong" (*Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248). This understanding of the foundation of the rule lends support to the conclusion that any wrongdoing which results in a witness' unavailability should vitiate the confrontation right, because otherwise the defendant would benefit from his wrongful conduct.

However, although the foundation supplied in *Reynolds* may be capable of supporting a very broad rule, the doctrine the Supreme Court actually applied in that case was extremely narrow. The rule the Court endorsed in *Reynolds* permits admission only of prior "testimony, taken on a former trial between the same parties upon the same issues." Even such evidence was held admissible only when the defendant "corruptly" or "wrongfully" kept the witness away. *Reynolds*, 98 U.S. at 158-59, 25 L. Ed. at 247-48. Moreover, *Reynolds* unequivocally imposed an "intent" requirement. Notwithstanding the broad basis for the rule, when the *Reynolds* Court discussed the guarantees of the confrontation clause, it stated that the Constitution grants an accused "the privilege of being confronted with the witnesses against him; but if he *voluntarily* keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." (Emphasis added.) *Reynolds*, 98 U.S. at 158, 25 L. Ed. at 247. The statement that the accused forfeits his confrontation rights when he "voluntarily" keeps the witnesses away is a clear expression of intent. Regardless of whether a broader rule could exist as a matter of equity, the rule laid down by the Supreme Court in *Reynolds* contemplates an accused intentionally procuring a witness' absence.

The Supreme Court's much more recent decision in *Davis* indicates that this remains the law. In reaffirming the rule, *Davis* stated:

> "We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. [Citation.] But when defendants *seek to undermine the*

-19-

*judicial process* by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal trial system." (Emphasis added and omitted.) *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280.

The Court here clearly states that not all conduct which happens to result in a witness' unavailability will constitute forfeiture by wrongdoing. Rather, only that conduct through which a defendant "*seek[s]* to undermine the judicial process" or "destroy the integrity of the criminal trial system" qualifies. This strongly connotes a requirement of intent. An act of assault, however heinous and reprehensible in its own right, is not without more an attempt to "undermine the judicial process." It becomes such only when the assault is motivated at least in part by an intent to interfere with or impede the process of a trial at which all witnesses with relevant knowledge appear and testify and are subject to cross-examination.

Another statement in *Davis* reinforces our conclusion. Federal Rule of Evidence 804(b)(6) provides an exception to the hearsay rule when the declarant is unavailable and the prior out-of-court statement is "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). The State and the dissent concede, as they must, that Rule 804(b)(6) contains an intent requirement, but argue that the equitable doctrine of forfeiture by wrongdoing is broader than Rule 804(b)(6). However, in *Davis* the Supreme Court stated that Rule 804(b)(6) "codifies the forfeiture doctrine." *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. Accord *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005); *United States v. Dhinsa*, 243 F.3d 635, 653 (2d Cir. 2001); *United States v. Ochoa*, 229 F.3d 631, 639 (7th Cir. 2000);*United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000); *Commonwealth v. Edwards*, 444 Mass. 526, 830 N.E.2d 158 (2005); *State v. Henry*, 76 Conn. App. 515, 533, 820 A.2d 1076, 1087 (2003). In other words, Rule 804(b)(6) and the equitable doctrine are coextensive, because the former is a legislative enactment of the latter. See Black's Law Dictionary 252, 1420 (7th ed. 1999) ("codification" is "[t]he

process of compiling, arranging, and systematizing the laws of a given jurisdiction, or of a discrete branch of the law, into an ordered code"; a "codifying statute" is "[a] law that purports to be exhaustive in restating the whole of the law on a particular topic, including prior caselaw as well as legislative provisions"). Thus, according to the Supreme Court–and the numerous other courts to have so held–Rule 804(b)(6) and its intent requirement reflect the common law equitable doctrine.

Considering Rule 804(b)(6) when analyzing the common law equitable doctrine of forfeiture by wrongdoing does not conflict with the statement in *Crawford* that the protection afforded by the confrontation clause does not depend on "the vagaries of the [r]ules of [e]vidence." See *United States v. Garcia-Meza*, 403 F.3d 364, 370 (6th Cir. 2005), quoting *Crawford*, 541 U.S. at 61, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370. This takes the statement from *Crawford* entirely out of context. *Crawford* was concerned with rejecting the notion that a defendant's confrontation clause rights are adequately protected so long as the rules against hearsay are satisfied. Rule 804(b)(6) was not at issue in *Crawford*; it was not even mentioned. Moreover, our point here is not that Rule 804(b)(6) has the power to force the common law and constitution to conform to its dictates, but rather that Rule 804(b)(6) was intended to be a reflection of the common law, to describe how the common law in fact operates. That is what a "codification" is. See Black's Law Dictionary 252 (7th ed. 1999).

The dissent contends that the advisory committee's notes establish that Rule 804(b)(6) is "designed to deter" witness tampering, "especially in the area of gang or organized crime." Slip op. at 69 (Thomas, C.J., dissenting, joined by Karmeier, J.). The committee notes at the time subsection (b)(6) was adopted provide:

> "Rule 804(b)(6) has been added to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness. This recognizes the need for a prophylactic rule to deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.' *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d

Cir. 1982), *cert. denied*, 467 U.S. 1204 (1984). The wrongdoing need not consist of a criminal act. The rule applies to all parties, including the government." Fed. R. Evid. 804, Notes of Advisory Committee on Rules–1997 Amendments.

Nothing here indicates that the rule was intended to be as limited in application as the dissent suggests. See also 4 S. Saltzburg, M. Martin & D. Capra, Federal Rules of Evidence Manual §804.02(16), at 804–35 (9th ed. 2006) (noting that although the rule was "derived from cases that have held that a criminal defendant forfeits his right to confrontation if he causes or acquiesces in the witness' unavailability," the rule "is not limited to criminal cases" but applies to "any party" who procures a witness' absence, including parties in civil cases and the prosecution in a criminal case). Regardless, given the Supreme Court's statement that the rule "codifies" the common law doctrine, any statement by the advisory committee suggesting otherwise would seem irrelevant.

What, then, of the numerous cases finding intent irrelevant to the doctrine? In short, they are all distinguishable. First, nearly all such cases predate *Davis* and the statements therein, *e.g.*, that the doctrine contemplates an effort to "undermine the judicial process" and that Rule 804(b)(6) "codifies," *i.e.*, reflects, the common law doctrine. See *United States v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005); *United States v. Emery*, 186 F.3d 921 (8th Cir. 1999); *United States v. Miller*, 116 F.3d 641 (2d Cir. 1997); *United States v. Mayhew*, 380 F. Supp. 2d 961 (S.D. Ohio 2005); *Gonzalez v. State*, 155 S.W.3d 603, 610-11 (Tex. App.–San Antonio 2004), *aff'd*, 195 S.W.3d 114 (Tex. Crim. App. 2006);[1] *People v. Hale*, 277 Wis. 2d 593, 691 N.W.2d 637 (2005); *People v. Bauder*, 269 Mich. App. 174, 712 N.W.2d 506 (App. 2005); *State v. Meeks*, 277 Kan. 609, 88 P.3d 789 (2004); *People v. Moore*, 117 P.3d 1 (Colo. App. 2004); *Commonwealth v. Salaam*, 65 Va. Cir. 405 (2004). Of the few cases which postdate

[1] Although the decision affirming the Texas appellate court was filed two days after *Davis*, the Court of Criminal Appeals of Texas declined to address whether intent was required for forfeiture by wrongdoing, because the court held that the requisite intent could be inferred in the circumstances of the case at bar. *Gonzalez*, 195 S.W.3d at 124-25.

*Davis*, none even acknowledge the statement therein that Rule 804(b)(6) "codifies" the common law rule. See *United States v. Natson*, No. 4:05–cr–21 (M.D. Ga. November 22, 2006); *Grayson v. Carey*, No. CIV S–03–1694–MCE–KJM (August 9, 2006) (findings and recommendations by United States Magistrate Judge Kimberly J. Mueller), adopted by district court, No. 2:03–cv–1694–MCE–KJM (September 8, 2006); *People v. Vasquez*, No. 04CA0729 (Colo. App. November 30, 2006), *cert. granted*, No. 07SC50 (March 26, 2007); *State v. Brooks*, No. W2004–02834–CCA–R3–CD (Tenn. Crim. App. August 31, 2006), *appeal granted,* No. W2004–02834–SC–R11–CD (January 22, 2007). But see *Brooks*, No.W2004–02834–CCA–R3–CD (Tipton, J., concurring and dissenting) (noting this language from *Davis* and stating that "if Justice Scalia's statement in *Davis* regarding the rule codifying the doctrine represents his usual clarity, I do not think we can ignore the defendant's intent in considering whether the forfeiture doctrine applies"). Second, so far as our research has discerned, every case holding intent irrelevant has involved the defendant's murdering the witness. As our appellate court has observed, "the prevailing view, in situations other than the unique situation detailed above, [is that] the intent or motive of a defendant in engaging in the conduct he does is relevant to whether the forfeiture by wrongdoing rule is invoked." *Melchor*, 362 Ill. App. 3d at 351.[2] The reason that it is nevertheless accurate to state that the majority of *cases* have found intent irrelevant is simply a numbers game–most cases to consider the question have involved the murder of the witness. *Henderson*, 35 Kan. App. 2d at 253, 29 P.3d at 654-55, *appeal granted*, No. 04–92251–AS (September 19, 2006).

---

[2]Of particular relevance to this case, intent has been required in prosecutions for domestic violence (*State v. Wright*, No. AO3–1197 (Minn. January 25, 2007)), a type of case which *Davis* acknowledged is "notoriously susceptible to intimidation or coercion of the victim to ensure she does not testify at trial" (*Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 243-44, 126 S. Ct. at 2279-80), as well as child sexual abuse (*State v. Henderson*, 35 Kan. App. 2d 241, 253, 129 P.3d 646, 655 (2006), *appeal granted*, No. 04–92251–AS (September 19, 2006)), the type of crime at issue in the instant case.

Moreover, although the above authority is distinguishable on the bases we have discussed, it might also be reconcilable with the general rule that intent is required. Notwithstanding that some cases contain broader language, the above cases have essentially held that the prosecution need not *prove* that the defendant committed murder with the intent of procuring the victim's absence. This is consistent with presuming such intent when the wrongdoing at issue is murder. When a defendant commits murder, notwithstanding any protestation that he did not specifically intend to procure the victim's inability to testify at a subsequent trial, he will nonetheless be sure that this would be a result of his actions. Murder is, in this sense, different from any other wrongdoing in which a defendant could engage with respect to a witness–more than a possibility, or a substantial likelihood, a defendant knows with absolute certainty that a murder victim will not be available to testify. Although we express no opinion on the topic, as it is not before us on this appeal, the total certainty that a murdered witness will be unavailable to testify could theoretically support presuming intent in the context of murder, while requiring proof of intent in all other situations.

Regardless, we find the cases involving murder distinguishable. As our appellate court has noted, outside of the context of murder, the authorities uniformly require proof of intent. See *Melchor*, 362 Ill. App. 3d at 351. Our review of *Reynolds* and *Davis* leads us to agree with this conclusion. Accordingly, we hold that the State must prove that the defendant intended by his actions to procure the witness' absence to invoke the doctrine of forfeiture by wrongdoing.

The State argues, however, that even if intent is relevant, the doctrine still ought to be applied in the case at bar because defendant did indeed intentionally procure the witness' absence. The State notes that both the victim's mother and Grote testified that the victim had told them defendant had warned her not to recount the incident. The victim's mother said that the victim told her that defendant had said he would hurt her if she discussed it. Although defendant only specifically cautioned the victim against telling her mother about the incident, the State argues that defendant's threats and warnings were intended to and did intimidate the victim generally, as evinced by the victim's statements to Machonkin that she did not want to testify because, in part, she was "scared."

-24-

There is sufficient evidence here that we cannot dismiss this argument out of hand. However, the applicability of the forfeiture-by-wrongdoing rule requires a factual determination that this court is ill-equipped to make in the first instance. The State did not rely on the theory of forfeiture by wrongdoing at trial because the circuit court ruled the evidence admissible–and because, of course, *Crawford* was not decided until this case was already on appeal. But if defendant is to be permitted to raise his confrontation clause claim for the first time on appeal, the State must equally be permitted to raise the responsive argument of forfeiture by wrongdoing. Accordingly, we believe the appropriate procedure is to remand the cause to the circuit court for a hearing on forfeiture by wrongdoing.

The Supreme Court has given some guidance regarding such hearings. Although the Court has not itself explicitly endorsed a specific burden of proof, the Court did note in *Davis* that both federal and state courts tend to hold that the State's burden of proof in a hearing on forfeiture by wrongdoing is a preponderance of the evidence. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. The Court also observed with apparent approval a state court ruling permitting consideration of " 'hearsay evidence, including the unavailable witness's out-of-court statements' " at such hearings. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280, quoting *Edwards*, 444 Mass. at 545, 830 N.E.2d at 174. We agree with both of these propositions, and direct that they be followed on remand.

However, it would be a waste of judicial resources for us to remand without first considering the merits of the underlying confrontation clause claim. The issue has been fully briefed before this court, and if the confrontation clause claim is invalid, after all, there is no reason for the circuit court to waste judicial resources in attempting to evaluate whether defendant waived it. Accordingly, we turn to the merits of defendant's confrontation clause claims.

### 3. *Merits*

#### a. General Analytical Framework

After *Crawford*, a testimonial statement of a witness who does not testify at trial is *never* admissible unless (1) the witness is

unavailable to testify, and (2) the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53-54, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365. Moreover, *Davis* made clear that the confrontation clause has *no* application to *non*testimonial statements. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273 ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is *not subject to the Confrontation Clause*" (emphasis added)); *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 238, 126 S. Ct. at 2274 (noting that *Crawford* had "suggested" that the confrontation clause applies only to testimonial hearsay and stating that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter").

Thus, the threshold question in confrontation clause analysis is, Are the statements at issue "testimonial"? If not, the confrontation clause places no restriction on their introduction (although they are still subject to "traditional limitations upon hearsay evidence" (see *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273)). If the statements are testimonial, the next question is, Will the declarant testify? If so, the confrontation clause again places no restriction on the introduction of the declarant's prior hearsay statements, as the defendant will have the opportunity to cross-examine–confront–the declarant. *Crawford*, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9. Finally, if the statements are testimonial and the declarant will not testify, then the statements are inadmissible unless both (a) the declarant is unavailable to testify, and (b) the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365.


b. "Testimonial Statements"

The Court has thus far declined to define a "testimonial" statement. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Rather, as previously noted, the Court's approach has been to steer away from generalized, abstract pronouncements and instead to focus on the particular statements under consideration.

However, although *Crawford* "did not set forth a detailed framework for addressing whether a statement is 'testimonial' " (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 246, 126 S. Ct. at 2282 (Thomas, J., concurring in the judgment and dissenting in part)), the Court did analyze the text of the confrontation clause itself, and in so doing suggested a two-part test for determining when a statement is testimonial. The Court began with the language of the confrontation clause, noting that it gives a defendant the right to be "confronted with the witnesses against him." The Court looked to an early version of Webster's dictionary, which defined "witnesses" as those who " 'bear testimony.' " *Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364, quoting 1 N. Webster, An American Dictionary of the English Language (1828). In turn, the Court noted, "testimony" was defined as a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364, quoting 1 N. Webster, An American Dictionary of the English Language (1828). Thus, those "witnesses" whom the confrontation clause gives a defendant the right to confront are those who bear "testimony," *i.e.*, solemn declarations for the purpose of establishing or proving some fact germane to the defendant's prosecution.[3]

a) Solemnity

Thus, there would appear to be two components to a "testimonial" statement. First, it must be made in solemn fashion. *Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364; *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276 (quoting *Crawford* and noting that "[t]he solemnity of even an oral declaration of relevant

---

[3]Although the Court did not dwell overly long on this formulation in *Crawford*, it does appear clear that the Court intended this discussion as a textual analysis of the confrontation clause. See *Crawford*, 541 U.S. at 42-43, 158 L. Ed. 2d at 187, 124 S. Ct. at 1359 (referring to above discussion as an understanding of the meaning of the phrase "witnesses against"). The importance of the discussion is further illustrated by the fact that the Court repeatedly returned to this definition and its two components in its subsequent discussions of "testimonial." See generally *Davis*, 547 U.S. __, 165 L. Ed. 2d 224, 126 S. Ct. 2266.

past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood"). In fact, the requirement of solemnity is a matter with regard to which the *Davis* majority and dissent were in agreement. See *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 246, 126 S. Ct. at 2282 (Thomas, J., concurring in the judgment and dissenting in part) ("the plain terms of the 'testimony' definition we endorsed [in *Crawford*] necessarily require some degree of solemnity before a statement can be deemed 'testimonial' "). The majority and dissent differed on whether the statements at issue in that case *satisfied* the solemnity requirement, with the majority reasoning that solemnity was established by the potential "severe consequences" of lying to a police officer (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276), whereas the dissent would have required the statements to be made in a setting with a higher degree of formality, possibly only if *Miranda* warnings had been issued (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 246-47, 126 S. Ct. at 2282-83 (Thomas, J., concurring in the judgment and dissenting in part)).

b) Intended to Establish a Particular Fact

The second requirement is that the statement must be intended to establish a particular fact. With respect to this requirement, the focus is on whether, at the time the statement was made, the witness was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred. See *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74 (statements in response to police questioning are nontestimonial when primary purpose of questioning is to "enable police assistance to meet an ongoing emergency"; responses to police questions are testimonial when "there is no such ongoing emergency, and [ ] the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"); *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 242, 126 S. Ct. at 2278 (statements which, after the fact, "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," are testimonial "because they do precisely *what a witness does* on direct examination" (emphasis in original)).

## 1) Intent of Questioner vs. Intent of Declarant

Regarding this second prong, the parties differ on whose perspective–whose "intent"–is dispositive. Defendant argues that a statement is testimonial if it is elicited "for the primary purpose of obtaining evidence with which to prosecute the offender." In other words, defendant would have us look to the perspective, the intent, of the person *eliciting* the statement. The State, by contrast, urges us to focus exclusively on the perspective of the *declarant*. In the State's view, the objective circumstances at the time that a testimonial statement is given must be such that the declarant would reasonably expect that his statements might be used in future judicial proceedings–that he would recognize that he is, in effect, "bearing witness" against the accused.

Each approach has its difficulties. Defendant's exclusive focus on the intent of the listener raises the obvious problem of statements which were not "elicited." For example, although in *Crawford* the Court described the trial of Sir Walter Raleigh as one of the "most notorious instances" of the type of abuse against which the Confrontation Clause was designed to defend (*Crawford*, 541 U.S. at 44, 158 L. Ed. 2d at 188, 124 S. Ct. at 1360), *Davis* acknowledged that Lord Cobham's letter against Raleigh "was plainly not the result of sustained questioning" (emphasis omitted) (*Davis*, 547 U.S. at __ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274 n.1). The State's exclusive focus on the declarant's intent, on the other hand, could lend itself to abuse by the State, by increasing use of statements gathered without the declarant's knowledge–for instance undercover interviews of witnesses.

### a) Statements Produced Through Police Interrogation

*Crawford* and *Davis* have begun to map out the contours of "whose intent matters." Because both cases involved statements produced by police interrogations, the matter is clearer in that context. In *Crawford*, the Court stated that "Statements taken by police officers in the course of interrogations are [] testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364. This broad formulation is devoid of reference to the intent of the declarant, which implies that rather than the

declarant's intent, the police intent to obtain information for prosecution is all that is relevant. In *Davis,* the Court explained that this was precisely its meaning:

> "When we said in *Crawford* [citation] that 'interrogations by law enforcement officers fall squarely within [the] class' of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 239-40, 126 S. Ct. at 2276.

In *Davis*, the Court recognized that not all police interrogations were for the purposes of gathering information for prosecution, however, and modified the broad rule it announced in *Crawford*:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.

The Court also noted that police focus could potentially shift from emergency assistance to future prosecution, such that during the course of a given interrogation some statements in response to questioning could be testimonial and others not. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 241, 126 S. Ct. at 2277. See also *In re T.T.*, 351 Ill. App. 3d 976, 992-93 (2004) (holding that child's statements to doctor for the purpose of medical diagnosis and treatment were nontestimonial, but identification of attacker in same interview was testimonial).

It is clear, therefore, that when the statements under consideration are the product of questioning by the police (or those whose "acts [are] acts of the police" (*Davis*, 547 U.S. at __ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2)), we must focus on the intent of the questioner in eliciting the statement. Moreover, our evaluation of that

intent must rely on objective circumstances, not testimony from the officer as to his actual subjective intent. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.

### b) Suggested Requirement of Police Involvement

The Court has not yet had occasion to apply the confrontation clause to statements other than those made in response to police interrogation. Indeed, the Court left open the questions not only "when" but "*whether*" statements made to persons other than law enforcement personnel are "testimonial." (Emphasis added.) *Davis*, 547 U.S. at __ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2.

Stepping into the breach, the State argues that only statements made to law enforcement personnel can be testimonial. In support of its government-involvement requirement, the State points to *Crawford*'s focus on the historical background of the confrontation clause in determining the clause's original meaning. Based on this historical review, *Crawford* arrived at a narrow list of four "modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. These practices included: "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and *** police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The State argues that a statement is testimonial only "if it is produced by virtue of one of these 'modern practices,' " each of which features government involvement in the production of a testimonial statement. In the State's view, "statements made to nongovernment officials simply cannot constitute 'testimonial' statements under the *Crawford* paradigm." We disagree.

In listing the "modern practices" to which the State refers, *Crawford* stated:

> "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' *Whatever else the term covers, it applies at a minimum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation

Clause was directed." (Emphasis added.) *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

This passage clearly states that the term "testimonial" applies, *at a minimum*, to these "modern practices." By prefacing this assertion with the phrase, "Whatever else the term covers," the Court implies that "testimonial" could include statements generated in ways *other* than these "modern practices." The State's assertion that a testimonial statement *must* have been produced by virtue of one of these practices finds no support in this passage in *Crawford*.

Moreover, while there is language in *Crawford* emphasizing the role of government officers in creating testimony, *Crawford* imposes no *per se* rule that a testimonial statement must be made to a government agent. R. Friedman, *Grappling With the Meaning of "Testimonial"*, 71 Brook. L. Rev. 241, 262 (2005). Nor does *Davis*, which specifically cautioned that the Court's opinion ought not to be read as implying that statements in the absence of police interrogation are "necessarily nontestimonial." *Davis*, 547 U.S. at __ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274 n.1.

Indeed, the trial of Sir Walter Raleigh suggests the opposite conclusion. As previously noted, part of the evidence against Raleigh was a letter by Lord Cobham, which "was plainly not the result of sustained questioning." (Emphasis omitted.) *Davis*, 547 U.S. at __ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274 n.1. Nevertheless, *Crawford* cited the Raleigh trial as a "notorious" example of the civil law abuses against which the confrontation clause was directed (*Crawford*, 541 U.S. at 44, 158 L. Ed. 2d at 188, 124 S. Ct. at 1360), abuses characterized by the admission of "testimonial" out-of-court statements as evidence against the accused, without benefit of cross-examination.

There is an additional objection to the State's requirement of government involvement. The State's argument relies heavily on the premise that there is a strong historical basis for such a requirement. But learned historians have described the theory that there must be government involvement as "profoundly ahistorical." R. Friedman & B. McCormack, *Dial-In Testimony*, 150 U. Pa. L. Rev. 1171, 1248 (2002). In England, state prosecutors did not become the norm for ordinary crime until the nineteenth century. Friedman, 71 Brook. L. Rev. at 261. Prior to that time, most prosecutions were private

lawsuits. 150 U. Pa. L. Rev. at 1248. "Until the state assumed the management of crime in the nineteenth century and professional police forces took over the pursuit and apprehension of suspects, the gathering of evidence, and the preparation of cases *** these matters were left largely to the private initiative of the victim." J.M. Beattie, Crime and the Courts in England 1660-1800 35 (1986). And "the right to confront was established long before [the nineteenth century]; indeed, in the sixteenth century Thomas Smith described the criminal trial as an 'altercation' between accuser and accused." Friedman, 71 Brook. L. Rev. at 261. Thus the State's main argument in support of its requirement of government involvement–that this requirement was rooted in historical practice that predated the adoption of the sixth amendment–has little basis in legal history.

Notwithstanding the foregoing, the State points to decisions where, according to the State, the courts concluded that "statements made to nongovernment officials simply cannot constitute 'testimonial' statements under the *Crawford* paradigm." Many of these decisions deal only cursorily with the issue of whether a testimonial statement requires government involvement. These decisions contain little, if any, analysis regarding this question, and we find them unpersuasive.

A decision cited by the State that does contain some analysis of this issue is *United States v. Savoca*, 335 F. Supp. 2d 385 (S.D.N.Y. 2004). There, a defendant sought to exclude statements given by his codefendant to his live-in girlfriend. The court concluded that the statements were not testimonial and therefore were not barred under *Crawford*. The court cited several reasons for this conclusion, one of which was that the statements were not made to a government official. According to the court, *Crawford* was meant to apply only to testimonial statements that were "made in the context of some governmental action." *Savoca*, 335 F. Supp. 2d at 392. The court based this conclusion on the premise that all of the examples of testimonial statements listed in *Crawford* were "made to an authority figure in an authoritarian environment." *Savoca*, 335 F. Supp. 2d at 393.

We disagree with *Savoca*'s premise and reasoning. First, even if the premise were correct, and all of the examples did share the trait the court observed, they were merely examples–the Court never stated

-33-

any governmental involvement requirement and indeed, in *Davis*, made clear that it had not done so. See *Davis*, 547 U.S. at __ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2 ("our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial' "). Moreover, we disagree with *Savoca'*s premise that all of the examples are statements "made to an authority figure in an authoritarian environment" (*Savoca*, 335 F. Supp. 2d at 393), because one of the examples was a simple affidavit. Surely, although some notaries public might be "authority figures" they certainly are not all, nor do they all work in environments which can fairly be described as "authoritarian." The universal rule *Savoca* sought to infer simply is not there.

The Court has not as yet given any indication that testimonial statements must be made to a government officer, and our own review of the authorities and the historical background–specifically Raleigh's case–leads us to the conclusion that statements can be testimonial even if not made directly to agents of the state.

### c) Statements Made Outside of Police Interrogation

Accordingly, the question remains how to determine whether statements are testimonial when they are made outside this context. We believe that the only proper focus is on the declarant's intent: Would the objective circumstances have led a reasonable person to conclude that their statement could be used against the defendant?

The *Davis* Court's focus on the interrogator's motive when the statements are the product of police interrogation is not inconsistent with focusing on the intent or motive of the declarant in other cases. See, *e.g.*, *State v. Scachetti*, 711 N.W.2d 508, 513 (Minn. 2006) (central question is " 'whether either a declarant or a government questioner is acting, to a substantial degree, in order to produce a statement for trial' "), quoting *State v. Bobadilla*, 709 N.W.2d 243, 252 (Minn. 2006). *Davis* itself made clear that even with regards to questions elicited in the course of a police interrogation, "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Davis*, 547 U.S. at __ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274

n.1. Moreover, it is important to remember that in *Davis* the Court was dealing *only* with statements produced in response to police questioning. The Court clearly left for another day any discussion of rules for evaluating "whether and when statements made to someone other than law enforcement personnel" (*Davis*, 547 U.S. at __ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2) or statements "made in the absence of any interrogation" (*Davis*, 547 U.S. at __ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274 n.1) might be "testimonial."

We believe that by focusing on the interrogator's intent, the Court was most likely acknowledging the reality that when a declarant is supplying information in response to direct police questioning, the declarant is rarely "in the driver's seat." Although ultimately it is the declarant's intent to which the confrontation clause looks, it is governmental abuse against which the clause is designed to guard. Thus, given that the ultimate question is whether the statement is being made " 'for the purpose of establishing or proving some fact' " (*Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364, quoting 1 N. Webster, An American Dictionary of the English Language (1828)), like "what a witness does on direct examination" (emphasis omitted) (*Davis*, 547 U.S. at __, 165 L. Ed. 2d at 242, 126 S. Ct. at 2278), it is the government's motives that are paramount when the government is directly involved in eliciting the statements at issue. This does not determine the proper focus when evaluating statements other than those produced by a government interrogation, however.

Before *Davis* was decided, many authorities concluded that the declarant's intent was paramount in *all* evaluations of whether a statement was testimonial. Authorities have noted that at least two of the three proposed definitions of "testimonial" in *Crawford* focus on the declarant's perspective in giving the statement. See, *e.g.*, M. Raeder, *Remember the Ladies and the Children Too: Crawford's Impact on Domestic Violence and Child Abuse Cases*, 71 Brook. L. Rev. 311, 318 (2005); *cf. People v. Vigil*, 127 P.3d 916, 925 (Colo. 2006) ( "the 'common nucleus' shared by the Supreme Court's three formulations of testimonial evidence [citation] centers upon the declarant's reasonable expectations"). The declarant-centered approach is favored by Professor Richard Friedman of the University of Michigan Law School, one of the scholars whose works *Crawford*

relied upon (see, *e.g.*, *Crawford*, 541 U.S. at 61, 158 L. Ed. 2d at 198, 124 S. Ct. at 1370) "in framing its re-definition of the Confrontation Clause." *United States v. Cromer*, 389 F.3d 662, 673 (6th Cir. 2004). Friedman, who has been closely associated with the testimonial approach to the confrontation clause (*Cromer*, 389 F.3d at 673), argues in favor of a definition of "testimonial" based on the declarant's anticipation that the statement would likely be used in prosecution. Friedman, 71 Brook. L. Rev. at 251-52, 255-59. Friedman asserts: "To be testimonial, it must appear from the perspective of the witness that the statement is transmitting information that will, to a significant probability, be used in prosecution." Friedman, 71 Brook. L. Rev. at 259.

An earlier version of this definition was adopted by the Sixth Circuit Court of Appeals in *Cromer*. After referring to pre-*Crawford* work by Friedman, *Cromer* concluded that his proposed definition of "testimonial" was "both well-reasoned and wholly consistent with the purpose behind the Confrontation Clause." *Cromer*, 389 F.3d at 674. According to *Cromer*, the "proper inquiry" in a testimonial analysis "is whether the declarant intends to bear testimony against the accused." *Cromer*, 389 F.3d at 675. This intent, *Cromer* held, "may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675. See also *Vigil*, 127 P.3d at 925 (quoting favorably *Cromer*'s explanation of this "proper inquiry") (collecting cases).

We agree with Professor Friedman and the *Cromer* court that outside of the context of statements produced in response to government interrogation, it is the declarant's perspective which is paramount in a testimonial analysis.

1) Objective Manifestations vs. Subjective Intent

However, even in this context we believe *Davis* can offer some guidance. There, the Court did not look to the actual subjective intent of the police officer conducting the interrogation leading to the statements in question. Rather, the Court clearly stated that the proper inquiry is what "the circumstances objectively indicate" the purpose of the interrogation to be. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 237,

126 S. Ct. at 2273-74. There is no reason to believe that the applicability of the confrontation clause would depend on objective manifestations of intent when the statement is the product of police interrogation but would depend on actual *subjective* intent outside of this context. Accordingly, in our view, the proper question is not whether the declarant actually did intend or foresee that his statement would be used in prosecution. Rather, the question is whether the objective circumstances indicate that a reasonable person in the declarant's position would have anticipated that his statement likely would be used in prosecution. See *Cromer*, 389 F.3d at 675; Friedman, 71 Brook. L. Rev. at 252.

2) Child Declarants

The fact that the instant case involves a child declarant complicates the issue, however. See *Lagunas v. State*, 187 S.W.3d 503, 519 (Tex. Ct. App. 2005) ("Courts around the nation have struggled with the application of *Crawford* to child witnesses"). Application of the objective approach to child witnesses raises the question of whether the child's age ought to be taken into account. In other words, when we speak of an "objective person" in the declarant's position, does that mean an objective witness the same age as the child, or an objective adult? There is authority for both views. One case holding that age should not enter into the equation is *Sisavath*, 118 Cal. App. 4th at 1402 n.3, 13 Cal. Rptr. 3d at 758 n.3 (rejecting the notion that "an 'objective witness' should be taken to mean an objective witness in the same category of persons as the actual witness–here, an objective four year old"). Citing *Sisavath*, the Maryland Court of Appeals has also concluded that a child's age should not play a part in resolving whether a statement is testimonial. See *State v. Snowden*, 385 Md. 64, 90-91, 867 A.2d 314, 329 (2005) (concluding that "an objective test, using an objective person, rather than an objective child of that age, is the appropriate test for determining whether a statement is testimonial in nature").

Both *Snowden* and *Sisavath* based their holdings on the important rights of criminal defendants which the confrontation clause serves to protect. However, the statements at issue in both cases were made in response to structured questioning which was clearly intended to produce testimony for trial. In *Sisavath*, for instance,

"[The interview] took place after a prosecution was initiated, was attended by the prosecutor and the prosecutor's investigator, and was conducted by a person trained in forensic interviewing. Under these circumstances, it does not matter what the government's actual intent was in setting up the interview, where the interview took place, or who employed the interviewer. It was eminently reasonable to expect that the interview would be available for use at trial." *Sisavath*, 118 Cal. App. 4th at 1403, 13 Cal. Rptr. 3d at 758.

Similarly, in *Snowden*,

"[The interviewer's] participation in this matter was initiated, and conducted, as part of a formal law enforcement investigation. The children were interviewed at the behest of Detective Davey of the Montgomery County Police Department, who was actively involved in the investigation. ***

*** Any argument as to the logistics or style of the interviews blatantly disregards the undeniable fact that *the express purpose of bringing the children to the facility to be interviewed was to develop their testimony for possible use at trial*." (Emphasis added.) *Snowden*, 385 Md. at 84-85, 867 A.2d at 325-26.

Because both *Snowden* and *Sisavath* predated *Davis*, the courts focused on the declarant's intent in making the statements at issue and believed that ignoring the declarant's age was the only way to protect the rights of the defendant. In the wake of *Davis*, however, the "objective circumstances" of the statements at issue in those cases would almost certainly lead courts to their being found testimonial *without* looking to the declarant's intent. Accordingly, we find *Sisavath* and *Snowden* to be of minimal guidance. After *Davis*, the means those courts chose–to disregard the age of the declarant–is no longer required to achieve the end the courts sought to serve–to protect the confrontation clause rights of defendants when police or their proxies question child victims.

On the other hand, numerous courts have held that in the case of a child's statement, age is among the circumstances which are relevant to evaluating whether the declarant would have reasonably

anticipated that his statement would be available for use at subsequent trial. See, *e.g.*, *Scachetti*, 711 N.W.2d at 514 (victim's statements in earlier case were not testimonial because "the three-year-old victim was not acting to preserve testimony for trial because children of that age are 'simply unable to understand the legal system and the consequences of statements made during the legal process' "), quoting *Bobadilla*, 709 N.W.2d at 255-56; *Vigil*, 127 P.3d at 925 ("an assessment of whether or not a reasonable person in the position of the declarant would believe a statement would be available for use at a later trial involves an analysis of the expectations of a reasonable person in the position of the declarant. Expectations derive from circumstances, and, among other circumstances, a person's age is a pertinent characteristic for analysis"); *In re D.L.*, 2005–Ohio–2320, ¶20 (a child's statements are testimonial under *Crawford* if " 'the circumstances surrounding the contested statements led the three-year-old to reasonably believe her disclosures would be available for use at a later trial, or that the circumstances would lead a reasonable child of her age to have that expectation' [citation]"); *Lagunas*, 187 S.W.3d at 519 (holding that a child's age and emotional state are factors to be considered in determining whether her statements were testimonial); *State v. Brigman*, 171 N.C. App. 305, 312-13, 615 S.E.2d 21, 25-26 (2005) (taking child's age into account in determining that her statements were nontestimonial).

In addition to the above authority, Professor Friedman has written directly on the issue of child witnesses:

> "the younger and less mature and understanding a child is, the less likely her statement should be considered testimonial, subject to the Confrontation Clause, and therefore, all other things being equal, the more likely the statement should be admitted. This conclusion, however, is really not paradoxical at all. Even statements by very young children may be highly probative. But very young children are not yet at a stage where they can be expected to take the responsibility of being a witness–the responsibility of speaking under oath, subject to questioning by the accused, under the implicit injunction, 'Look me in the eye and say that.' With respect to very young children–I will not try to say here just how young–we should admit their statements for what they are worth, without

pretending that the children have the capacity to act like adults." (Emphasis omitted.) R. Friedman, *The Conundrum of Children, Confrontation, and Hearsay*, 65 Law & Contemp. Prob. 243, 251-52 (2002).

In accordance with the weight of authority, as well as Professor Friedman's analysis, we believe that the better view is to treat the child's age as one of the objective circumstances to be taken into account in determining whether a reasonable person in his or her circumstances would have understood that their statement would be available for use at a later trial.

Like other courts which have considered the issue of what makes a statement testimonial, we believe it would be fruitless to attempt to provide an exhaustive list of factors which may potentially enter into the "testimonial" calculus and the weight to be accorded them. See, *e.g.*, *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005); *T.T.*, 351 Ill. App. 3d at 991-92 ("Vague standards are manipulable, and *** if the State could simply use the surrogate testimony of social workers provided that certain formalities–like a scheduled interview at a government office in a question-and-answer format–were absent, then prosecutors would have less motivation to acclimate the child witness to the courtroom setting"). As *Crawford* and *Davis* make clear, this determination must be made on a case-by-case basis. Each case must be resolved on its own merits, and a pertinent factor in one case may not carry much weight in another. In this case, because the parties differ on the issue of whether the age of a child declarant may *ever* be taken into consideration, and because there is a divergence of opinion on the topic amongst the courts of our sister states, we have held that factor may be considered. This is not to say that age will necessarily be determinative in every case. We have simply held that it is among the circumstances potentially relevant to evaluating whether the objective circumstances of the statement would have led a reasonable declarant to understand that his or her statement could be used in a subsequent prosecution of the defendant.

### c. Application

We turn now to an examination of the hearsay statements at issue in the case at bar to determine whether they are testimonial. As noted,

M.M.'s statements to three persons were admitted at trial. Those individuals were Joan G., M.M.'s mother; Ann Grote, a nurse/clinical specialist in charge of the child-abuse team at Hope Children's Hospital; and Perry Yates, the school social worker at Lawn Manor Primary Center, where M.M. was in kindergarten in 1998-99. We first review the circumstances under which the statements were made.

On January 13, 1999, Brenda Galete drove M.M. to Joan's place of employment. Galete went inside to get Joan, and told her that M.M. was to be taken to the hospital. Joan went with Galete to the car, sat next to to M.M., put her arm around her, and asked her what was wrong. M.M. told Joan that "Bob had done something to her." During the drive to the hospital, M.M. described the incident of sexual abuse. She also told Joan that her assailant had told M.M. he would hurt her if she told her mother about what had happened.

When they arrived at Christ Hospital, Joan and M.M. went to the emergency room. While they were there, Ann Grote, the clinical specialist in charge of the hospital's child-abuse team, came to the emergency room and met Joan and M.M. The responsibilities of Grote's position were to receive all referrals regarding any type of abuse, "whether it be physical or sexual abuse." Because there was potentially a two- to three-hour wait before M.M. could be examined, Grote took Joan and M.M. to her office in another building where Grote could speak to M.M., then bring M.M. back to the emergency room so she could be examined.

Joan waited in a nearby area while Grote took M.M. into a playroom that was connected to Grote's office. Grote began her interview with M.M. by asking her why she had come to the hospital. M.M. said "she was there because of what Bob had done to her." M.M. described for Grote the incident of sexual abuse that she had previously described to her mother. M.M. told Grote that she "didn't want to do it" but that Bob "made her do it." M.M. added that she "didn't like" Bob and she was "mad[ ] at him." At the conclusion of this interview, Grote took Joan and M.M. back to the emergency room, where M.M. was then examined by a doctor. After bringing M.M. back to the emergency room, Grote informed Joan that she would file a report, contact the police, and verify that the Department of Children and Family Services was notified.

The next day, January 14, 1999, Perry Yates, the social worker at M.M.'s school, received a telephone call from Joan G. Yates testified that the information Joan gave him "put [him] in a position where [he] had to make a mandated report based on the information that the mother had given [him]." Yates testified that he "had a legal obligation to check it out." Yates received Joan's permission to speak to M.M. individually, and he brought M.M. to his office, where he interviewed her. Yates began the interview by asking M.M., "[W]hat can you tell me about Robert Stechly[?]" M.M. then described essentially the same incident of sexual abuse that she had recounted for Grote and her mother.

Later that same day, at about 3 p.m., M.M. returned to the hospital for another interview with Grote. This interview was observed by an assistant State's Attorney and two police officers, who were seated behind a one-way mirror. Grote began the interview by asking M.M. if she could remember why she had come to the hospital the previous day. M.M. "said she could remember[;] it was because of what Bob had done to her." M.M. again described the incident of sexual abuse. At trial, Grote was asked if M.M. told her how she felt at the time of the incident. Grote stated: "She said she was mad, she said that she didn't like it, she didn't want to do it, but he told her she had to." At Grote's suggestion, M.M. took two anatomically correct dolls, undressed the male doll, and demonstrated the actions she had told Grote that defendant had forced her to perform.

We will begin with the clearest case: M.M.'s second conversation with Grote. At this time M.M. had already told Grote what happened. Based on what she had heard, Grote contacted the police department, and then conducted a second interview to review the same facts for the benefit of two police officers standing hidden behind a one-way mirror. The objective circumstances leave no room for doubt that at this time Grote was acting on behalf of the police in order to gather information for possible prosecution. Under *Davis*, this was unquestionably a testimonial statement.

We believe that M.M.'s first conversation with Grote and her conversation with Yates were also testimonial statements under *Davis*. Both Grote and Yates conducted their interviews of M.M. after Joan apprised them of some of what M.M. had told her–in other words, once they were aware that abuse may have occurred. Although

-42-

Grote was a registered nurse, nothing in the record indicates that she conducted the first interview for purposes of treatment in this case. Grote did testify that one of her responsibilities was making sure that the appropriate follow-up medical procedures took place with the alleged child abuse victims in the hospital, but she also testified that in this case she told Joan after the first interview only that she would be notifying "the appropriate authorities," *i.e.*, the Department of Children and Family Services and the police. Grote testified further that after the second interview, she did not know what happened with M.M., because her "piece was done." Yates testified that he only initiated the conversation because what Joan told him led him to conclude that he "had to make a mandated report" and "had a legal obligation to check it out." The record does not reflect any action by either Grote or Yates subsequent to their interviews other than informing the Department and/or the police of what they had learned. We believe that the objective circumstances indicate that the primary purpose of these interviews was to gather information for purposes of an investigation and possible prosecution of criminal conduct.

We do not hold that any person who conducts an interview in order to gather information for a possible future prosecution is necessarily acting as an "agent of law enforcement" at the time, such that his acts may be said to be "acts of the police." In this case, however, we believe that Grote and Yates were so acting. It is significant that in this case neither Grote nor Yates appears to have taken any action as a result of their interviews of M.M. other than contacting the authorities–the Department of Children and Family Services, law enforcement, or both. Their interviews appear to have been for the sole purpose of gathering information in order to pass it along to the authorities.

Our conclusion is supported by the fact that at the time of their interviews of M.M., Grote and Yates were both "mandated reporters." See 325 ILCS 5/4 (West 2000) (mandated reporters include, *inter alia*, any "hospital administrator and personnel engaged in examination, care and treatment of persons," "school personnel," "registered nurse," and "social worker"). This means that by virtue of their positions, they both had a legal obligation, under penalty of criminal law, to report to the Department of Children and Family Services once they had reasonable cause to believe that a child known

to them in their professional capacity was abused or neglected. 325 ILCS 5/4 (West 2000). Mandated reporters are required to "testify fully in any judicial proceeding resulting from such report, as to any evidence of abuse or neglect, or the cause thereof." 325 ILCS 5/10 (West 2000). Moreover, the Department is required, "to the fullest extent possible," to

> "cooperate with and *** seek the cooperation and involvement of all appropriate public and private agencies, including *** law enforcement agencies, [and] courts of competent jurisdiction ***." 325 ILCS 5/7.1 (West 2000).

Thus, by virtue of their status as mandated reporters both Yates and Grote were legally required to report to the Department and then to testify, and the Department itself was also required to cooperate with law enforcement. These facts substantially buttress our conclusion that in this case, in conducting their interviews of the victim M.M., Grote and Yates were acting as agents of law enforcement for purposes of confrontation clause analysis. See *T.T.*, 351 Ill. App. 3d at 989-91 (taking into account statutes governing mandated reporters in holding that child's statement to social worker was testimonial for purposes of confrontation clause analysis). We are not holding that every mandated reporter acts as an agent of law enforcement in every interview, but merely that Grote's and Yates' status as mandated reporters supports our conclusion in this case based on the fact that their actions appear to have had no other purpose than to obtain information to pass on to the authorities.

However, M.M.'s statement to her mother is of a different nature. First, Joan was not acting as an agent of law enforcement. According to Joan's testimony, at the time this statement was made, Joan had only been told that her daughter needed to go to the hospital. Joan immediately left work and was sitting next to M.M. in the backseat of the car on the way there. When Joan asked M.M. "what happened," she surely would only have feared hearing how her child had been injured. Nothing suggests that Joan would have had any hint that M.M.'s response would recount a criminal act. Even assuming that Galete's contrary version of events was true, and that Galete did tell Joan of M.M.'s allegation of abuse before the ride to the hospital, we believe Joan's primary motivation was simple parental concern. On

the facts of this case, Joan was in no way acting on behalf of law enforcement, attempting to gather evidence for a future prosecution.

Accordingly, we must look at the statement from the perspective of M.M., the declarant. M.M. was five years old. She was sitting next to her mother in the backseat of a car on a ride to a hospital. Her mother asked her what had happened. From M.M.'s perspective, she was explaining to her mother the reason for the trip to the hospital. We see nothing in these circumstances to support the conclusion that an objective declarant in M.M.'s position would have anticipated that her statement to her mother likely would be used in prosecution. We note that it is also debatable whether M.M.'s statement in this context was infused with sufficient solemnity to be deemed testimonial. See *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276; *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 246-47, 126 S. Ct. at 2282-83 (Thomas, J., concurring in the judgment and dissenting in part).

Accordingly, M.M.'s two statements to Grote and her statement to Yates were testimonial. Because defendant had no prior opportunity to cross-examine M.M. with regard to these statements, their admission was a violation of the confrontation clause under *Crawford*. M.M.'s hearsay statement to her mother, on the other hand, was not testimonial. Accordingly, the admission of this statement was not error under *Crawford*.

We feel compelled once more to note the limited extent of our holding. We do not conclude in this case that statements made to family members can never be testimonial, nor that statements given to social workers or medical personnel or other mandated reporters are always testimonial. Instead, we decide merely that, under the circumstances in this case, M.M.'s hearsay statements to Grote and Yates were testimonial, and her statement to her mother was not.

The State protests that neither Grote nor Yates, the school social worker, functions as "an arm of the prosecution" merely because they are mandated reporters, and calls our attention to *In re C.J.*, 166 Ill. 2d 264 (1995). The State argues that we there clearly held that Department employees are not state agents simply because they are required to investigate suspected abuse and neglect. The State calls our attention to the specific statement that we "reject out of hand any notion that [Department] child protective service investigators, simply by virtue of their mandate to investigate reports of suspected

child abuse and neglect, are a prosecutorial arm of the State." *C.J.*, 166 Ill. 2d at 269.

The case is distinguishable. First, in this case, we have not found Grote and Yates to have been acting on behalf of law enforcement merely based on their status as mandated reporters. Our conclusion is instead based primarily on the circumstances surrounding the statements they took from M.M., especially the fact that they appear to have done nothing as a result of taking those statements other than contacting the authorities. The fact that they are mandated reporters merely buttresses our conclusion. Moreover, *C.J.* was an appeal from a circuit court ruling dismissing a delinquency petition because a Department investigator had destroyed potentially exculpatory material. We held it would be entirely unfair to impute responsibility for the destroyed evidence to the State's Attorney, especially in light of the fact that there was "no evidence to support the conclusion that the [Department] investigator here functioned, intentionally or otherwise, as an aid in the prosecution of this case." *C.J.*, 166 Ill. 2d at 270. The situation here is different–in this case the question is whether it is fair for a criminal defendant to be tried based on hearsay statements without the opportunity to confront the declarant, when the persons taking the statements took no action other than to pass them on to the authorities, and moreover the persons taking the statements had a legal obligation to transmit them to the Department (325 ILCS 5/4 (West 2000)) and subsequently to testify in any case arising therefrom (325 ILCS 5/10 (West 2000)), and the Department had a legal obligation to cooperate with law enforcement agencies to the fullest extent possible (325 ILCS 5/7.1 (West 2000)). In addition to the statement from *C.J.* to which the State draws our attention, we also said in that case that "where DCFS acts at the behest of and in tandem with the State's Attorney, with the intent and purpose of assisting in the prosecutorial effort, *DCFS functions as an agent of the prosecution*." (Emphasis added.) *C.J.*, 166 Ill. 2d at 270, citing *People v. Robinson*, 157 Ill. 2d 68 (1993) (imputation of such knowledge requires an individualized focus on the factual circumstances). We do not believe that the framers intended to permit the government to evade the requirements of the confrontation clause by the simple expedient of placing responsibility for investigation

-46-

with a separate agency of government with a legal responsibility to cooperate with law enforcement.

The State also argues that, if the statements at issue in the case at bar are deemed testimonial, the admission of these statements was harmless beyond a reasonable doubt. We disagree.

*Crawford* violations are subject to harmless-error analysis. *People v. Patterson*, 217 Ill. 2d 407 (2005). The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Patterson*, 217 Ill. 2d at 428. There are

> "three different approaches for measuring error under this harmless-constitutional-error test: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Patterson*, 217 Ill. 2d at 428, citing *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981).

Under none of the three approaches can the error in this case be considered harmless. The evidence in question consists of several adults who were unacquainted or only slightly acquainted with M.M. testifying as to her out-of-court statements regarding the precise conduct at issue. The statements were quite clear and were relatively consistent with each other and with the statement M.M. made to her mother. This was strong evidence which a fact finder would surely have taken into account. As we have noted, "[t]he statements of a victim identifying her attacker and describing the attack are extremely powerful evidence of a defendant's guilt. It would be difficult to argue that such statements did not contribute to [a guilty] verdict." *Patterson*, 217 Ill. 2d at 436. Nor is it fair to characterize the improperly admitted evidence as "merely cumulative" of Joan's testimony. It is true that M.M.'s two statements to Grote and statement to Yates were substantially similar to her statement to Joan. However, the fact that the testimony was coming from adults who had no personal stake in the matter at hand, no acquaintance with Joan or defendant, and little or no acquaintance with M.M., and the strong similarity of the statements, gave them a power beyond simple

duplication of Joan's testimony as to what her daughter told her. Additionally, both Grote and Yates testified as to M.M.'s demonstration of the conduct at issue through the use of dolls, another fact reinforcing the believability of those statements and distinguishing them from M.M.'s statement to Joan. Moreover, and especially critically, the conversation between M.M. and Yates began with Yates simply asking M.M. what she could tell him "about Robert Stechly." That M.M. recounted the events in question in response to a generic query about the defendant is crucial evidence. The defense at trial was not that there was a question whether M.M. was the victim of abuse–defendant's expert agreed that she most likely was–but that there was a reasonable doubt as to the identity of her abuser. The improperly admitted statements cannot fairly be considered to be merely duplicative of properly admitted evidence.

This leaves the question whether the properly admitted evidence in the case constitutes "overwhelming evidence support[ing] the conviction," the sole remaining way in which this testimony might be found not to have contributed to the finding of guilt, and therefore be deemed harmless. Here we part company with the dissent. The dissent would find the error harmless because the properly admitted evidence, specifically the testimony of Joan, the testimony of Grote, and defendant's confession, is overwhelming. The dissent relies principally on defendant's statement to the police as well as Joan's testimony that in the car on the way to the hospital M.M. told her that "Robert Stechly" was the person who abused her. The dissent also notes that the abuse was described nearly identically in Galete's and Joan's trial testimony regarding what M.M. told them and in defendant's statement to the police. Examination of the record reveals some troubling inconsistencies in this evidence, however, which lead us to conclude that the evidence was not so overwhelming as to render it clear beyond a reasonable doubt that the constitutional error was harmless.

For example, although M.M.'s description of the abuse to Galete was very similar to what the child told her mother, there is a reason that Galete was a witness for the defense, rather than for the prosecution. Specifically, Galete testified that Bob Reilly, the victim's cousin, frequently babysat the victim, contradicting Joan's testimony that he never did so. Galete testified that M.M. only identified the

abuser as "Bob," and Galete further testified that she had informed the police that she believed that people other than defendant, including Joan, the child's mother, had sexually assaulted her. Thus not only did Galete directly contradict Joan's testimony on the key point of whether Bob Reilly had babysat M.M.–Joan testified that he had never done so–Galete also implicitly made clear that she believed that M.M. had not told the complete truth about her abuse.

Moreover, although Joan testified that on the date that the victim was taken to the hospital Galete refused to tell her what was wrong, Galete testified that she did tell Joan that the victim had been sexually molested and that Joan "really didn't show any feeling in response." Finally, Galete testified that she did not hear any conversation between the victim and her mother in the car on the way to the hospital. Although she admitted that she was in the front seat and the victim and her mother were in the back, this does call into question the foundation of one of the primary pieces of competent evidence on which the dissent relies, namely, Joan's testimony regarding her conversation with M.M. on the way to the hospital. Galete's father, who was driving the car to the hospital, also testified that he heard no conversation between Joan and M.M. Galete's testimony that she did tell Joan about the abuse before they drove M.M. to the hospital is also supported by the testimony of Grote. Grote testified that when M.M. was brought to the hospital Joan recounted that M.M. had told *Galete* about having been abused. Grote testified that Joan did not tell her that M.M. had directly spoken to Joan about the matter, even though that conversation in the car would have occurred only minutes before. Joan never told Grote that she had spoken with M.M. in the car.

Moreover, Joan's testimony that M.M. identified her assailant as "Robert Stechly"–using not only defendant's last name, but his full first name–was in direct conflict with Joan's testimony at the section 115–10 hearing. There, Joan testified only that the child told her "Bob" had assaulted her. Joan testified four separate times on direct examination as to what M.M. told her "Bob" had done, and on cross-examination, engaged in the following exchange:

> "Q. [defense counsel:] Now, in the car when you were on the way to the hospital, she told you what had happened, details of the incident?

A. Yes.

Q. Did she tell you who?

A. She told me in the back of the car that day.

Q. Who it was?

A. Who did that, yes.

Q. Who had sexual contact?

A. Yes.

Q. And *she said Bob*?

A. Yes.

Q. And *you understood that* to be Bob Stechly?

A. Yes sir." (Emphases added.)

This calls into serious question Joan's trial testimony that the child referred to defendant by his full first and last names. In this regard it is also noteworthy that no other witness ever testified that the child used defendant's full name, even though it would arguably have been more logical for the child to identify her assailant by his full name to a stranger, rather than to her mother, who was the defendant's girlfriend.

Defendant's confession, it is true, is surely strong evidence against him. However, at trial, defendant recanted his confession, claiming that he only made it because he was tired and believed that the truth would later come out. He introduced expert testimony to the effect that he was unable to understand his *Miranda* rights. In argument at defendant's bench trial, defense counsel noted, "I think, if you listen to him on the stand, he does have, how should I say, he does suffer from a mental disability, unfortunately." The members of this court are, of course, wholly unable to evaluate the accuracy of this description, as we were not present at defendant's trial to observe his demeanor, but we note that the State did not dispute this characterization in its argument in response.

The dissent implies a great deal of skepticism for defendant's recantation, but whether or not we personally find the recantation believable on the cold record before us is not the question we must answer, as we are not members of defendant's jury. The question before us is: Was the properly admitted evidence against defendant–consisting primarily of his confession, and the testimony

of the mother and Galete–such compelling and overwhelming evidence of guilt that it is clear beyond a reasonable doubt that the improperly admitted evidence made *no difference* to the fact finder? That evidence being the testimony of impartial, neutral adults that the child told the exact same story as she told her mother three more times, demonstrating the conduct at issue with dolls–and that one of these recountings of what transpired was in response to the general question "what can you tell me about Robert Stechly"?

We must answer this question in the negative. The child's consistent repetition of the story *strongly* reinforced its believability. This reinforcement could easily have overridden any doubt which might have arisen in light of the significant conflicts and inconsistencies between Galete's testimony, the testimony of the victim's mother, and defendant's confession. The fact that M.M.'s statement to Yates was the product of a generic inquiry regarding defendant is evidence that it would be truly impossible for a fact finder not to have taken into account in this trial which turned on the identity of M.M.'s abuser. We cannot conclude that the properly admitted evidence was so overwhelmingly in favor of guilt that it is clear beyond a reasonable doubt that the child's repetition of the story on three separate occasions played no part in the fact finder's conclusion.

Our conclusion that the evidence against defendant was not overwhelming is buttressed by the fact that the jurors at defendant's first trial were unable to agree on a verdict. See *People v. Gibson*, 136 Ill. 2d 362, 382-83 (1990) ("The jurors at the defendant's first trial were unable to agree on a verdict in the case, and the resulting mistrial illustrates fully the closeness of the evidence in the case"). The dissent argues that it is inappropriate to consider the fact that defendant's jury was unable to reach a verdict, suggesting that to do so is equivalent to the approach taken by the appellate court in *People v. Nitz*, 219 Ill. 2d 400 (2006). The situation in *Nitz* is not even remotely similar to the case at bar. There, the appellate court analyzed a jury's mix of guilty and not-guilty verdicts and "speculated" as to how the jury *might* have ruled on a question with which it was *not* presented after "purporting to read the minds of the trial jurors." *Nitz*, 219 Ill. 2d at 413-14. Here, by contrast, we are making the entirely unremarkable assertion that the fact that a jury of defendant's peers

was unable to reach a verdict as to his guilt tends to show that the evidence against him was not utterly overwhelming. This fact is especially pertinent in light of the fact that the jury heard and took into account the strong and compelling evidence that we have now concluded was improperly admitted. Even with that evidence before it, the jury could not reach a verdict. Thus, it is a fair inference that the properly admitted evidence may not have been entirely overwhelming. Nor does the riposte that the circuit court was able to reach a finding carry much weight, in light of the fact that like the jury, the court had before it and considered the evidence we have now found inadmissible. In this case it would be inappropriate to apply the presumption that in a bench trial judges base their findings only on competent evidence (*People v. Todd*, 178 Ill. 2d 297, 330 (1997); *People v. Tye*, 141 Ill. 2d 1, 26 (1990)), in light of the fact that at the time of defendant's trial, *Crawford* had not yet been decided and thus the statements to Grote and Yates were competent, admissible evidence so far as the trial judge knew.

We cannot conclude beyond a reasonable doubt that the admission of these hearsay statements did not contribute to the finding obtained. The properly admitted evidence was certainly sufficient to sustain defendant's conviction, however, so there is no double jeopardy bar to retrying defendant on these charges. *People v. Daniels*, 187 Ill. 2d 301, 310 (1999). If the evidence is as overwhelming as the dissent believes, defendant will very likely be convicted once again. Moreover, defendant's convictions may be upheld without a retrial if on remand the circuit court concludes that defendant lost his confrontation rights pursuant to the doctrine of forfeiture by wrongdoing. But unless that doctrine is applicable, the admission of these statements was error of sufficient severity as to defy a characterization of harmlessness.

Accordingly, we remand to the circuit court for a hearing on forfeiture by wrongdoing. In this hearing, the State's burden of proof is a preponderance of the evidence. See *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280 (and authorities cited therein). The circuit court may take into consideration " 'hearsay evidence, including the unavailable witness's out-of-court statements.' " *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280, quoting *Edwards*, 444 Mass. at 545, 830 N.E.2d at 174. The question is

whether defendant sought "to undermine the judicial process by procuring or coercing silence from" M.M. *Davis*, 547 U.S. at __, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. If the court concludes that defendant did forfeit his confrontation clause claim by wrongdoing, then the conviction and sentence may be reinstated; otherwise, defendant must receive a new trial. At that trial, the statements to Yates and Grote must be excluded from evidence unless M.M. testifies.

## II. Section 115–10

Having concluded that M.M.'s hearsay statement to her mother is not testimonial, we must address defendant's argument that this statement did not meet the requirements of section 115–10 of the Code of Criminal Procedure (725 ILCS 5/115–10 (West 1998)), which is the statutory hearsay exception for sexual abuse victims under the age of 13. Under section 115–10, a child's out-of-court complaints of a sexual offense may be admitted if (1) the time, content, and circumstances of the statement provide sufficient safeguards of reliability, and (2) the child either (a) testifies at the proceeding, or (b) is unavailable as a witness and there is corroborating evidence of the act which is the subject of the statement. In the case at bar, the trial court found that the time, content, and circumstances of M.M.'s hearsay statements, including her statement to her mother, provided sufficient safeguards of reliability to be admissible. The trial court also found that M.M. was legally unavailable for trial.

Before this court, defendant argues that the State failed to meet its burden of establishing the reliability of M.M.'s hearsay statements, and the circuit court therefore erred in admitting these statements. Defendant also argues that the circuit court erred in declaring M.M. unavailable to testify. The appellate court below affirmed the circuit court's findings as to reliability and availability. We agree with the appellate court that, with regard to M.M.'s statement to her mother, the reliability and unavailability requirements of section 115–10 were met. A trial court's rulings on evidentiary matters will not be reversed absent a clear abuse of discretion. *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000). Fear and youth are factors to be considered in determining whether a child witness is unavailable. *T.T.*, 351 Ill. App. 3d at 984.

Reliability is judged based on the totality of the circumstances (*Wright*, 497 U.S. at 819-20, 111 L. Ed. 2d at 654-55, 110 S. Ct. at 3148-49), but relevant factors include consistent repetition, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *People v. McMillan*, 231 Ill. App. 3d 1022, 1026 (1992). There was ample evidence supporting the circuit court's rulings regarding reliability and unavailability, and we find no abuse of discretion in the circuit court's ruling admitting M.M.'s statement under section 115–10.

The partial concurrence argues that the circuit court abused its discretion in finding M.M. unavailable, relying on *People v. Johnson*, 118 Ill. 2d 501 (1987). That case is distinguishable in critical respects. First, *Johnson* involved only Supreme Court Rule 414, a rule of general application to all criminal cases. In contrast, section 115–10 deals specifically with "the difficulty in convicting persons accused of sexually assaulting young children." *People v. Holloway*, 177 Ill. 2d 1, 9 (1997). The *Johnson* court expressly limited its holding importing the standards of Federal Rule 804 to proceedings involving Rule 414: "the mere unwillingness of an otherwise available witness to testify simply does not rise to the high level of the Federal Rule 804 standards. Hence, it cannot constitute excusable unavailability *for purposes of our Rule 414*." (Emphasis omitted and added.) *Johnson*, 118 Ill. 2d at 509-10. Neither *Johnson*, nor either of the post-*Johnson* cases on which the partial concurrence relies, involved section 115–10. See *People v. Caffey*, 205 Ill. 2d 52, 100-01 (2001) (adult witness asserting privilege); *People v. Ramey*, 152 Ill. 2d 41, 70-73 (1992) (adult witness asserting lack of memory). This court has never invoked Federal Rule of Evidence 804 or relied on *Johnson* in reviewing the admission of statements pursuant to section 115–10. Indeed, *Johnson* could not have been intended to apply to statements admitted pursuant to section 115–10 because at the time *Johnson* was decided, section 115–10 did not permit introduction of the out-of-court statement of an "unavailable" child witness. *People v. Rocha*, 191 Ill. App. 3d 529, 537 (1989).

Moreover, this court in *Johnson* invited legislative action to address reluctant child witnesses, thus suggesting that a specific statute to address that situation might merit a different result:

"[W]e feel compelled to acknowledge the special difficulties presented by cases such as these, where the witness in question is a young child whose fear and reticence is probably nonvolitional and hence understandable. However, it is our view that any attempts to resolve these difficulties must be initiated by the legislature." *Johnson*, 118 Ill. 2d at 510.

As our appellate court has noted, the amendment to section 115–10 to permit the introduction of children's out-of-court statements when the child is unavailable appears to be precisely the legislative resolution for which this court called in *Johnson*. *Rocha*, 191 Ill. App. 3d at 537. In cases involving section 115–10, our appellate court has declined to apply the broad *Johnson* holding that unwillingness can never constitute unavailability. See, *e.g.*, *People v. Coleman*, 205 Ill. App. 3d 567, 582-83 (1990); *Rocha*, 191 Ill. App. 3d at 536-37. This holding finds support in decisions of this court which have distinguished section 115–10 from other, analogous statutes. See *People v. Bowen*, 183 Ill. 2d 103, 114 (1998) ("*Bastien* is not dispositive of this case, because of fundamental differences in both the provisions and purposes of section 115–10 and former section 106A–2"). In the context of child witnesses, numerous other jurisdictions have concluded that unwillingness or inability to testify should constitute unavailability. See *Rocha*, 191 Ill. App. 3d at 537-38, and cases cited therein. Our appellate court has concluded that by the amendment to section 115–10 the legislature intended "to include within the meaning of 'unavailable' witnesses those children who are unable to testify because of fear, inability to communicate in the courtroom setting, or incompetence." *Rocha*, 191 Ill. App. 3d at 539. See also *T.T.*, 351 Ill. App. 3d at 984. We agree with these opinions. Notwithstanding our holding in *Johnson* that unwillingness to testify cannot constitute unavailability to testify *for purposes of Rule 414*, we believe that in the separate specific context of section 115–10, unavailability includes those child witnesses who are unable to testify because of fear.

The circuit court should not make an unavailability determination lightly, of course, but that brings us to the second critical difference between this case and *Johnson*. There, the circuit court received no expert testimony or evidence as to the child's unavailability. Indeed, the circuit court never even made a finding that the children were

unavailable to testify. In the instant case, by contrast, Machonkin testified as an expert witness at the availability hearing. She stated that in her professional opinion, forcing M.M. to testify would inflict upon her "trauma symptoms." It is true that Machonkin acknowledged that there were steps the court could take to attempt to decrease the likelihood that the child would suffer psychological harm. However, she stated that it could take up to a year for such techniques to work and they might *never* work, a distinct possibility in light of the fact that Machonkin herself had never been able to persuade the victim to discuss what had happened.

Under these circumstances, we cannot find the circuit court to have abused its discretion in finding M.M. unavailable to testify.

CONCLUSION

We agree with the appellate court that the circuit court's decision that M.M.'s hearsay statement to her mother was admissible under section 115–10. However, we disagree with the appellate court that the circuit court properly found M.M.'s hearsay statements to Grote and Yates were admissible. Because the admission of the statements to Grote and Yates was not harmless error, we reverse the appellate court's judgment affirming defendant's conviction and sentence. This cause is remanded to the circuit court for a hearing on the issue of forfeiture by wrongdoing and for further proceedings in conformity with this opinion.

*Appellate court judgment reversed;*
*cause remanded with directions.*

JUSTICE KILBRIDE, concurring in part and dissenting in part:

In my opinion, the statutory hearsay exception contained in section 115–10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115–10 (West 1998)), was not satisfied because the evidence presented at the hearing did not establish that M.M. was unavailable to testify. M.M.'s hearsay statements should have been excluded on that basis.

Moreover, in addressing the confrontation clause claim, I believe the plurality applies an incorrect standard for determining whether an

out-of-court statement by a child declarant is testimonial. I would hold that the critical inquiry in determining whether a statement is testimonial is whether a reasonable adult in the declarant's position would have anticipated that his or her statement likely would be used in a criminal prosecution. A reasonable adult in M.M.'s position would have believed her statements to her mother, the registered nurse, and the school social worker identifying defendant as the perpetrator would be used in a prosecution against defendant. Thus, M.M.'s statements to each of those people were testimonial and should not have been admitted without satisfying the requirements of the confrontation clause.

In my view, the plurality's analysis of both the section 115–10 issue and the confrontation clause claim is faulty. I, however, agree with the plurality's ultimate holding on the confrontation clause claim that defendant's convictions must be reversed and the cause remanded for a hearing on forfeiture by wrongdoing. Accordingly, I concur in the judgment with respect to the confrontation clause claim and respectfully dissent on the section 115–10 issue.

## I. Section 115–10

The threshold issue in this case is whether M.M.'s statements are admissible under the statutory hearsay exception in section 115–10. See *People v. Lee*, 214 Ill. 2d 476, 482 (2005) (courts should avoid addressing a constitutional question if a case can be decided on other grounds). Under section 115–10, a child's out-of-court statements concerning a sexual offense are admissible if: (1) there are sufficient safeguards of reliability; and (2) the child either testifies or is unavailable to testify and there is corroborating evidence of the act that is the subject of the statement. 725 ILCS 5/115–10(b) (West 1998).

Here, the plurality has failed to apply this court's established precedent to the unavailability determination. This court's decision in *People v. Johnson*, 118 Ill. 2d 501 (1987), as well as subsequent cases relying on *Johnson*, strongly support a finding that the circuit court abused its discretion in finding M.M. unavailable to testify.

In *Johnson*, the defendant was charged with aggravated indecent liberties with a child. The trial court ordered the testimony of the five-year-old victim and her seven-year-old brother to be recorded on

videotape outside the presence of the jury. *Johnson*, 118 Ill. 2d at 505. During her testimony, the victim became frightened and stopped speaking. At that point, the trial court granted the State's motion to remove defendant from the courtroom during her testimony. *Johnson*, 118 Ill. 2d at 505. Defendant was allowed to view the testimony on a video monitor outside the courtroom. *Johnson*, 118 Ill. 2d at 505. After defendant was removed, the parties completed the direct, cross, and redirect examination of the victim. *Johnson*, 118 Ill. 2d at 505. The testimony of the victim's brother was recorded outside the presence of the jury, but with defendant present. *Johnson*, 118 Ill. 2d at 506.

The appellate court held that the videotaping procedure was authorized under Supreme Court Rules 414 and 206(f) (87 Ill. 2d Rs. 414, 206(f)). *Johnson*, 118 Ill. 2d at 507. Rule 414 allows the trial court to order a deposition for use at trial in criminal cases when a substantial possibility exists that the testimony will be " 'unavailable at the time of hearing or trial.' " *Johnson*, 118 Ill. 2d 507, quoting 87 Ill. 2d R. 414(a). Thus, the critical issue in *Johnson* was whether the children were "unavailable" to testify within the meaning of Rule 414. *Johnson*, 118 Ill. 2d at 508.

This court rejected the appellate court's determination that the children were unavailable to testify because the trial court believed they would be fearful or unable to speak in front of the jury. *Johnson*, 118 Ill. 2d at 508. This court held that unavailability "is a narrow concept, subject to a rigorous standard." *Johnson*, 118 Ill. 2d at 509. The court looked to Federal Rule of Evidence 804 for examples of sufficient reasons for finding a witness unavailable. Under Federal Rule 804, a witness may be declared unavailable due to privilege, persistent contemptuous refusal to testify, lack of memory, death, or illness. *Johnson*, 118 Ill. 2d at 509. Mere unwillingness or reluctance to testify does not constitute excusable unavailability under Federal Rule 804. *Johnson*, 118 Ill. 2d at 509. Therefore, this court held that unwillingness to testify cannot be the basis for a finding of unavailability under Supreme Court Rule 414. *Johnson*, 118 Ill. 2d at 509-10. This court concluded that "a witness' mere reluctance to testify cannot be accepted as a good enough reason to permit the use of out-of-court testimony." *Johnson*, 118 Ill. 2d at 510.

Subsequent to *Johnson*, this court has continued to look to Federal Rule of Evidence 804 in determining whether a witness is

unavailable to testify. See *People v. Caffey*, 205 Ill. 2d 52, 100-01 (2001); *People v. Ramey*, 152 Ill. 2d 41, 70-73 (1992). In this case, however, neither the appellate court nor the plurality has applied our established precedent.

The plurality asserts that *Johnson* "is distinguishable in critical respects." Slip op. at 53. But the distinctions noted by the plurality do not affect the core issue, the meaning of the term "unavailable" in the context of a child witness. *Johnson* is indistinguishable on that point because it involved whether child witnesses were unavailable to testify. The plurality also states that this court has never relied on *Johnson* in reviewing the admission of statements under section 115–10. Slip op. at 54. My research has not revealed any prior decision of this court specifically defining the standard for unavailability under section 115–10. That explains the plurality's reliance only upon appellate court cases for the applicable standard for reviewing the statements at issue here. The fact that this court has not previously relied on *Johnson* in this context is perhaps understandable given that this court has not addressed the definition of unavailability under section 115–10.

Further, the plurality claims that "the amendment to section 115–10 to permit the introduction of children's out-of-court statements when the child is unavailable appears to be precisely the legislative resolution for which this court called in *Johnson*." Slip op. at 54. If the legislature intended to redefine unavailability of child witnesses in response to *Johnson*, however, one would expect an express statement in the statute redefining that term. Yet, there is nothing in section 115–10 indicating that a different standard for unavailability should be used than the one employed by this court in *Johnson*. See 725 ILCS 5/115–10 (West 1998). The amendment to section 115–10 does not indicate a legislative intent to alter the definition of unavailability in the context of child witnesses. To the contrary, the amendment without any change to the accepted standard in *Johnson* indicates the legislature's approval of this court's construction of that term.

I would also note that the plurality's ultimate conclusion on the standard to be applied is confusing. The plurality wavers between stating *unwillingness* to testify is sufficient to constitute unavailability and asserting *inability* to testify is required. Slip op. at 55. In fact, the plurality's final word on the matter is "[n]otwithstanding our holding

in *Johnson* that unwillingness to testify cannot constitute unavailability to testify *for purposes of Rule 414*, we believe that in the separate specific context of section 115–10, unavailability includes those child witnesses who are unable to testify because of fear." (Emphasis in original.) Slip op. at 55. The plurality fails to recognize that unwillingness to testify and inability to testify are entirely different standards. In fact, the apparent standard adopted by the plurality of inability to testify caused by fear is consistent with *Johnson* because it requires more than mere reluctance or unwillingness. See *Johnson*, 118 Ill. 2d at 509-10.

I would hold that the core rule in *Johnson* that unwillingness or reluctance to testify cannot constitute unavailability is applicable here. I agree that fear and other similar factors are proper in determining whether a child witness is unavailable to testify. To meet the standard in *Johnson*, however, there must be an inability to testify because of fear or another factor, not mere reluctance or unwillingness. As this court stated in *Johnson*, "mere reluctance to testify cannot be accepted as a good enough reason to permit the use of out-of-court testimony." *Johnson*, 118 Ill. 2d at 510.

Here, the sole witness at the availability hearing was Nancy Machonkin, a clinical child psychologist hired by M.M.'s father to determine the potential impact of testifying upon M.M. As noted in the plurality opinion, Machonkin testified that M.M. expressed unwillingness and reluctance to testify. M.M. told Machonkin that she did not want to talk about the alleged abuse and would not talk about it. Slip op. at 5. Although Machonkin testified that M.M. would likely experience anxiety, sleep disturbance, and difficulty in concentrating if she were forced to testify, on cross-examination Machonkin acknowledged that there were steps the court could take to minimize the stress of testifying. Significantly, Machonkin testified that M.M. could possibly become acclimated to the courtroom in as little as two weeks by visiting the courtroom when it was empty, talking to the judge in chambers, and meeting the people who would be asking her questions.

Based on Machonkin's testimony, the trial court found M.M. unavailable to testify. The court noted that M.M. had refused to discuss the incident with Machonkin, and concluded that testifying would subject M.M. to fear and anxiety that would further traumatize her.

The evidence presented at the availability hearing essentially shows that M.M. expressed an unwillingness and reluctance to testify. There was no showing that M.M. was unable to testify because of fear or any other factor. In fact, Machonkin testified that the stress of testifying could potentially be overcome in as little as two weeks by acclimating M.M. to the courtroom and the trial process. Nevertheless, no effort was made to acclimate M.M. All of M.M.'s statements were admitted based solely on the trial court's acceptance of Machonkin's untested conclusion that testifying would subject M.M. to fear and anxiety. In contrast, in a case relied upon heavily by the plurality, the trial court determined that the child witness was unavailable only after she stopped testifying during direct examination, and after the trial court and the prosecutor made extensive efforts to get her to resume testifying. *T.T.*, 351 Ill. App. 3d at 985-86.

In this case, M.M. did not testify at trial. I also note that the trial court did not have M.M. testify at the availability hearing to make a direct observation of her reported fear and anxiety. The trial judge did not even speak to M.M. in chambers to observe her demeanor. Instead, the court simply deferred to Machonkin's opinion that it was not in M.M.'s best interest to testify and that she was unavailable, despite the concession that M.M.'s stress could potentially be overcome in as little as two weeks. The evidence here shows a mere untested reluctance to testify. Reluctance alone is insufficient to support a finding of unavailability under the standard adopted by this court in *Johnson*.

The trial court's ruling was unsupported by application of this court's precedent. In my view, the failure to apply this standard was an abuse of discretion. The statutory hearsay exception in section 115–10 was not satisfied because the evidence does not establish that M.M. was unavailable to testify. M.M.'s hearsay statements should not have been admitted under section 115–10, and the trial court's ruling was prejudicial error. Thus, it is unnecessary to address whether admission of M.M.'s statements violated the confrontation clause. The plurality has, nonetheless, chosen to base its holding on defendant's confrontation clause claim. Therefore, I will also address that issue.

## II. Confrontation Clause Claim

In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the Supreme Court reaffirmed the importance of the constitutional right to confrontation. The Court held that a testimonial hearsay statement of a witness who is unavailable to testify may not be admitted against a criminal defendant unless the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The *Crawford* Court explicitly declined to give a comprehensive definition of "testimonial statements." See *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Nonetheless, as noted by the plurality, many authorities have concluded that the focus in determining whether a statement is testimonial is always on the declarant's intent in giving the statement. Slip op. at 35. Significantly, "[t]he declarant-centered approach is favored by Professor Richard Friedman of the University of Michigan Law School, one of the scholars whose works *Crawford* relied upon [citation] 'in framing its re-definition of the Confrontation Clause.' " Slip op. at 35, quoting *United States v. Cromer*, 389 F.3d 662, 673 (6th Cir. 2004). Professor Friedman has asserted that "[t]o be testimonial, it must appear from the perspective of the witness that the statement is transmitting information that will, to a significant probability, be used in prosecution." R. Friedman, *Grappling With the Meaning of "Testimonial,"* 71 Brook. L. Rev. 241, 259 (2005). The plurality agrees that the declarant's perspective is the focus in a testimonial analysis outside the context of statements produced by government interrogation. Slip op. at 36.

The plurality, however, concludes that the Supreme Court's recent decision in *Davis v. Washington*, 547 U.S. ___, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), modified or clarified the analysis with respect to statements made to government officials. Slip op. at 16. According to the plurality, *Davis* held that the intent of a police officer in taking a statement determines whether the statement is testimonial. Slip op. at 16. I disagree with that conclusion.

In *Davis*, the Supreme Court held that:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate

-62-

that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.

In my view, this holding does not indicate a shift in the focus to the intent of the police officer in taking the statement. Rather, the holding indicates that the perspective of the declarant is still the focus of the inquiry. The circumstances presented by the police interrogation are viewed from the perspective of the declarant, and the question is what those circumstances objectively indicate to the declarant concerning the primary purpose of the interrogation.

In *Davis*, the Court stated that "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Davis*, 547 U.S. at ___ n.1, 165 L. Ed. 2d at 237 n.1, 126 S. Ct. at 2274 n.1. The plurality acknowledges that "ultimately it is the declarant's intent to which the confrontation clause looks." Slip op. at 35. I would hold that the focus in determining whether a statement is testimonial remains on the declarant's intent.

The plurality also concludes that a child's age "is among the circumstances potentially relevant to evaluating whether the objective circumstances of the statement would have led a reasonable declarant to understand that his or her statement could be used in a subsequent prosecution of the defendant." Slip op. at 38. In my opinion, the cases holding that a child's age should *not* be considered in determining whether a statement is testimonial are persuasive and should be followed. See *People v. Sisavath*, 118 Cal. App. 4th 1396, 1402 n.3, 13 Cal. Rptr. 3d 753, 758 n.3 (2004); *State v. Snowden*, 385 Md. 64, 90-91, 867 A.2d 314, 329 (2005).

In *Sisavath*, the court rejected the notion that "an 'objective witness' should be taken to mean an objective witness in the same category of persons as the actual witness–here, an objective four year old." *Sisavath*, 118 Cal. App. 4th at 1402 n.3, 13 Cal. Rptr. 3d at 758 n.3. Instead, the court found that the Supreme Court likely meant that a statement is testimonial if its use in a criminal prosecution is reasonably foreseeable to an objective observer. *Sisavath*, 118 Cal. App. 4th at 1402 n.3, 13 Cal. Rptr. 3d at 758 n.3.

In *Snowden*, the court recognized that the confrontation clause is designed to protect the fundamental rights of the accused. *Snowden*, 385 Md. at 90, 867 A.2d at 329. The court noted that the interest in protecting victims from testifying may never outweigh the explicit confrontation clause guarantee of the right to be confronted with the witnesses at trial. *Snowden*, 385 Md. at 90, 867 A.2d at 329, citing *Coy v. Iowa*, 487 U.S. 1012, 1019-21, 101 L. Ed. 2d 857, 866-67, 108 S. Ct. 2798, 2802-03 (1988). The court, therefore, concluded that "an objective test, using an objective person, rather than an objective child of that age, is the appropriate test for determining whether a statement is testimonial in nature." *Snowden*, 385 Md. at 90-91, 867 A.2d at 329.

Under the plurality's holding, the protections of the confrontation clause will not apply to an entire category of out-of-court statements by young children. The plurality holds that a child's age may be considered in determining whether a reasonable declarant would understand that his or her statement could be used in a subsequent prosecution. Slip op. at 40. Very young children, however, are simply not aware of the existence of the criminal justice system and are, therefore, incapable of anticipating that their statements likely would be used in a prosecution. Thus, under the plurality's decision, the confrontation clause will not apply to statements of children under the age where they become aware of the criminal justice system, at least when the statement is made to someone other than a government agent.

This result cannot be squared with the confrontation clause. The confrontation clause provides that a criminal defendant "shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The plain language of this constitutional provision indicates that it applies to all witnesses. There is no express exception for testimony of child witnesses, and the Constitution contains no provision creating a testimonial privilege for them. Child witnesses often provide the critical evidence in criminal prosecutions. The plurality's holding simply does not comport with either the express language of the confrontation clause or the Supreme Court's decision in *Crawford*.

I would note that there are ways to satisfy a defendant's right to confrontation while mitigating any potential impact of testifying on a child witness. In this case, Nancy Machonkin, a clinical child

psychologist, testified that M.M. could possibly become acclimated to the courtroom in a short time by visiting the courtroom when it was empty, talking to the judge, and meeting the attorneys and other participants in the trial. Defendant suggests that M.M.'s anxiety or fear might have been reduced by allowing her to testify with her mother nearby or by testifying in a room other than the courtroom. Further, M.M. could have been allowed to testify by closed-circuit television if certain requirements were met. See 725 ILCS 5/106B–5 (West 1998). Testimony by closed-circuit television was an option in this case that may have greatly reduced any adverse effects of testifying. See 725 ILCS 5/106B–5 (West 1998). Although these and other steps may possibly be taken to acclimate a child to testify, the interest in protecting children from testifying may not outweigh the explicit constitutional right to be confronted with the witnesses at trial. *Snowden*, 385 Md. at 90, 867 A.2d at 329, citing *Coy v. Iowa*, 487 U.S. 1012, 1019-21, 101 L. Ed. 2d 857, 866-67, 108 S. Ct. 2798, 2802-03 (1988).

In sum, I believe that the same test should be applied to all witnesses in determining whether a statement is testimonial. That test is whether the circumstances objectively indicate that a reasonable adult in the declarant's position would anticipate that his or her statement likely would be used in a criminal prosecution.

I agree with the plurality that M.M.'s statements to Ann Grote and Perry Yates were testimonial. Those statements were made in a sufficiently solemn setting to be considered testimonial. The objective circumstances indicate that the primary purpose of those interviews was to collect information for a possible criminal prosecution. Based on the objective circumstances, a reasonable adult would have anticipated that the statements would be used in a criminal prosecution.

I disagree, however, with the plurality's determination that M.M.'s statement to her mother, Joan G., was not testimonial. The record shows that M.M. informed her babysitter, Brenda Galete, of the sexual abuse by "Bob." Galete went to Joan's place of employment. After locating Joan, Galete informed her that M.M. needed to be taken to the hospital because Galete believed M.M. was being sexually molested. Joan got into the backseat of the car with M.M. Galete did not hear any conversation between Joan and M.M. on the ride to the hospital.

Joan testified that Galete came to her workplace and stated they needed to take M.M. to the hospital. Galete did not tell Joan the reason that M.M. needed to go to the hospital. Joan got into the backseat of the car, put her arm around M.M., and asked her, "What's wrong?" M.M. stated that "Bob had done something to her." M.M. then described the incident of sexual abuse by "Bob."

First, I believe that these statements were made with sufficient solemnity to be considered testimonial. M.M. was driven to her mother's workplace. Her mother got off of work, came to the car, and sat in the backseat with M.M. Her mother, who is undoubtedly an authority figure to M.M., asked her, "What's wrong?" M.M. certainly would have understood that she may be subject to discipline if she did not treat this matter seriously after having her mother take time off of work. These facts indicate that this was an important matter. The seriousness of the situation was apparent. Thus, I would find that the solemnity requirement was established.

The next question, then, is whether the circumstances objectively indicate that a reasonable adult in M.M.'s position would anticipate that her statement likely would be used in a prosecution. The focus is on whether "the witness was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred." Slip op. at 28. In response to her mother's question, M.M. described an incident of sexual abuse by "Bob." Thus, M.M. gave information concerning an event that had previously occurred. Her statement did not focus on her physical condition or any injury she may have suffered. A reasonable adult in M.M.'s position would recognize that the acts she was describing constituted a serious criminal offense. Based on these facts, I would find that a reasonable adult in M.M.'s position would anticipate that her statement likely would be used in a prosecution.

I would, therefore, find that M.M.'s statements to her mother, Grote, and Yates were testimonial. The admission of those statements violated the confrontation clause because defendant did not have a prior opportunity to cross-examine M.M.

I agree with the plurality that admission of the statements in violation of the confrontation clause cannot be deemed harmless error. I also agree with the portion of the plurality opinion addressing forfeiture by wrongdoing.

### III. Conclusion

In my opinion, this appeal should have been decided based solely on the section 115–10 issue. See *Lee*, 214 Ill. 2d at 482 (constitutional questions should be avoided if a case can be decided on other grounds). The hearsay exception in section 115–10 was not satisfied because the evidence did not establish that M.M. was unavailable to testify. M.M.'s statements to her mother, Grote, and Yates should have been excluded as inadmissible hearsay. Defendant's convictions should be reversed and the cause remanded for a new trial without admission of those hearsay statements.

I also disagree with the plurality's analysis of the confrontation clause claim. While the plurality holds that only the statements to Grote and Yates were testimonial, I would hold that those statements as well as the one to M.M.'s mother were testimonial and should not have been admitted without satisfying the requirements of the confrontation clause. Nonetheless, I agree with the plurality's ultimate judgment on the confrontation clause claim reversing defendant's convictions and remanding the cause for a hearing on forfeiture by wrongdoing.

In this case, the other members of this court are divided and without my vote for one of their positions it would not be possible to secure the constitutionally required concurrence of four judges for a decision (see Ill. Const. 1970, art. VI, §3). This appeal would be dismissed with the effect being the same as an affirmance by an equally divided court of the decision under review. See *People v. Griffith*, 212 Ill. 2d 57, 58 (2004), citing *Perlman v. First National Bank of Chicago*, 60 Ill. 2d 529, 530 (1975). In my opinion, affirming the appellate court's decision upholding defendant's convictions is not the appropriate result, particularly given that *Crawford* was not decided until after the appellate court rendered its decision. Defendant, therefore, did not have the opportunity to present his claim based upon *Crawford* in the appellate court, and he would be denied any relief on that claim if the appellate court judgment were simply affirmed. Thus, I reluctantly concur specially in the judgment on the confrontation clause claim reversing defendant's convictions and remanding the cause for a hearing on forfeiture by wrongdoing. I respectfully dissent on the section 115–10 issue.

CHIEF JUSTICE THOMAS, dissenting:

I agree with the plurality's conclusion that the child's statement to her mother was admissible. I also agree with the conclusion that the child's statements to Grote and Yates were "testimonial" under the *Crawford/Davis* framework.

I dissent because I believe that the plurality wrongly holds that the child's statements to Grote and Yates amounted to reversible error and were not harmless in light of the overwhelming evidence against defendant that was properly admitted. I also disagree with the plurality's analysis of the forfeiture-by-wrongdoing issue. I believe it should have been unnecessary to address the forfeiture issue given that the admissions of the improper statements were harmless error. Assuming *arguendo* that the forfeiture issue had to be addressed, however, I would find that the cause should be remanded for a determination of whether defendant forfeited his confrontation rights by his own wrongdoing, but I would not limit that inquiry, as the plurality does, to the consideration of whether defendant intended to threaten the victim into not testifying. For all of these reasons and as more fully explained below, I respectfully dissent.


I. Forfeiture by Wrongdoing

The plurality concludes that the doctrine of forfeiture by wrongdoing focuses on a defendant's intent rather than his wrongdoing. Under the plurality's view, a defendant should be able to escape the common law forfeiture doctrine if his motive for assaulting the victim did not include preventing the victim from later testifying as a witness. I do not believe that this is a correct application of the doctrine.

There is no requirement of intent when it is the defendant's assault or murder of the victim that causes the witness' unavailability. *United States v. Garcia-Meza*, 403 F.3d 364, 370 (6th Cir. 2005) ("There is no requirement that a defendant who prevents a witness from testifying against him through his own wrongdoing only forfeits his right to confront the witness where, in procuring the witness's unavailability, he intended to prevent the witness from testifying"); *People v. Giles*, No. S129852 (March 5, 2007).

In *Giles*, the Supreme Court of California recently conducted an extensive discussion of the common law forfeiture doctrine and held

that a defendant forfeits his confrontation rights if the witness is genuinely unavailable to testify and "the unavailability [is] caused by defendant's intentional criminal act." *Giles*, slip op. at 25. The *Giles* court further held that there is no requirement that the defendant intend to prevent the witness from testifying when committing the criminal act. *Giles*, slip op. at 18. In so holding, the California Supreme Court adopted the reasoning of its Court of Appeal, stating that

> " '[f]orfeiture is a logical extension of the equitable principle that no person should benefit from his own wrongful acts. A defendant whose intentional criminal act renders a witness unavailable for trial benefits from his crime if he can use the witness's unavailability to exclude damaging hearsay statements by the witness that would otherwise be admissible. This is so whether or not the defendant specifically intended to prevent the witness from testifying at the time he committed the act that rendered the witness unavailable.' "
> *Giles*, slip op. at 18-19.

Other courts have applied forfeiture in cases where the defendant is charged with the same homicide that rendered the witness unavailable, rather than with some underlying crime about which the victim was going to testify. See *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999); *United States v. Miller*, 116 F.3d 641, 667-68 (2d Cir. 1997); *State v. Meeks*, 277 Kan. 609, 615, 88 P.3d 789, 794 (2004).

The plurality claims that the lone policy behind the forfeiture doctrine is to deter witness intimidation and that this purpose is not served if the doctrine is applied in the absence of an intent to prevent testimony because it is "after all, impossible to deter those who do not act intentionally." Slip op. at 18. But the true purpose behind the common law doctrine of forfeiture by wrongdoing is broader than the plurality recognizes and should not be confused with the federal statutory hearsay exception, which does have the limited purpose of addressing witness intimidation. In that regard, Federal Rule of Evidence 804(b)(6) provides a statutory hearsay exception for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6). Obviously, this provision requires an intent to prevent the witness from

testifying. The historical impetus behind the rule indicates that it was designed to deter the incentive to tamper with witnesses (Fed. R. Evid. 804(b)(6), Advisory Committee's Note), especially in the area of gang or organized crime, which was thought to be on the increase in the 1980s and early 1990s just prior to the rule's promulgation (L. Birdsong, *The Exclusion of Hearsay Through Forfeiture by Wrongdoing–Old Wine in a New Bottle–Solving the Mystery of the Codification of the Concept into Federal Rule 804(b)6*, 80 Neb. L. Rev. 891, 905-07 (2001)). See also *People v. Giles*, slip op. at 9-10 (Federal Rule 804(b)(6) is simply an expression of the rule applied in the glut of witness tampering cases that began to appear in the 1960s and 1970s when the federal government began placing greater emphasis on the prosecution of organized crime and drug activity).

In contrast to the statutory hearsay exception of the federal rule, the common law doctrine of forfeiture by wrongdoing has a broader grasp. The United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 62, 158 L. Ed. 2d 177, 199, 124 S. Ct. 1354, 1370 (2004), noted that "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." *Crawford* never mentioned Rule 804(b)(6), but instead referred to the common law doctrine, reaching all the way back to the 132-year-old case of *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1879). *Reynolds* emphasized that the common law rule "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248. By reaching back to the common law underpinnings of the doctrine rather than simply referring to the federal rule, *Crawford* is strong support for the position that intent to prevent a witness from testifying is not always required for application of the common law forfeiture doctrine.

*Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982), explained that the common law forfeiture doctrine has dual purposes: in addition to being a strong incentive to prevent witness tampering, it is also based on something similar to the equitable doctrine of clean hands. *Steele* elaborated on the broader purposes of the doctrine as follows: "The law prefers live testimony over hearsay, a preference designed to protect everyone, particularly the defendant. A defendant cannot prefer the law's preference and profit from it, as the Supreme

Court said in *Reynolds*, while repudiating that preference by creating the condition that prevents it." *Steele*, 684 F.2d at 1202.

The Sixth Circuit Court of Appeals emphatically debunked the notion that a defendant must always intend to prevent a witness from testifying before losing his confrontation rights on account of his wrongdoing, explaining that

> "[t]hough the Federal Rules of Evidence may contain such a requirement [of intent], *see* Fed. R. Evid. 804(b)(6), the right secured by the Sixth Amendment does not depend on, in the recent words of the Supreme Court, 'the vagaries of the Rules of Evidence.' *Crawford*, 124 S. Ct. at 1370. The Supreme Court's recent affirmation of the 'essentially equitable grounds' for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive. The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit." *Garcia-Meza*, 403 F.3d at 370-71.

The plurality claims that the forfeiture doctrine applied in *Reynolds* was "extremely narrow" and that the case "unequivocally imposed an 'intent' requirement." Slip op. at 19. The plurality is wrong on both counts.

The doctrine applied in *Reynolds* was not narrow. Rather, the Court merely employed language targeted to address the specific facts presented to it, before turning to the broader purposes of the forfeiture doctrine. The plurality relies on the specific language to the exclusion of the general, and thereby misinterprets the forfeiture doctrine.

In *Reynolds*, the defendant was indicted on a bigamy charge in the Territory of Utah. The government wanted to call one of defendant's alleged wives as a witness, but when the subpoena was delivered, the defendant told the officer that the subject was not home, that he would not tell the officer where she was, and that she would not appear in the case. Unable to locate the witness on a return visit the next day, the government immediately attempted to introduce her prior testimony from a former bigamy trial involving the same defendant. The court allowed the testimony, and the defendant was

convicted. The defendant eventually appealed to the United States Supreme Court, contending that the admission of the testimony violated his confrontation rights.

The Supreme Court affirmed the defendant's conviction, noting that

"[t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." *Reynolds*, 98 U.S. at 158, 25 L. Ed. at 247.

The above-quoted language is specific to the facts and does not attempt to explain the general parameters of the common law forfeiture doctrine in all cases. Later in its analysis, however, *Reynolds* did turn to the general, equitable basis for the rule:

"The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong; and, consequently, if there has not been, in legal contemplation, a wrong committed, the way has not been opened for the introduction of the testimony. We are content with this long-established usage, which, so far as we have been able to discover, has rarely been departed from. It is the outgrowth of a maxim based on the principles of common honesty, and, if properly administered, can harm no one." *Reynolds*, 98 U.S. at 159, 25 L. Ed. at 248.

Unlike the plurality, most courts have not interpreted *Reynolds* as fashioning an "intent" requirement. See, *e.g.*, *United States v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005); *United States v. Emery*, 186 F.3d 921 (8th Cir. 1999); *United States v. Miller*, 116 F.3d 641 (2d Cir. 1997); *United States v. Natson*, 444 F. Supp. 2d 1296 (M.D. Ga.

2006); *Grayson v. Carey*, No. 2:03–cv–1694–MCE–KJM (E.D. Cal. 2006); *People v. Giles*, No. S129852 (March 5, 2007); *Gonzalez v. State*, 155 S.W.3d 603, 610 (Tex. App.–San Antonio 2004); *State v. Meeks*, 277 Kan. 609, 88 P.3d 789 (2004); *People v. Vasquez*, No. 04CA0729 (Colo. App. November 30, 2006), *cert. granted*, No. 07SC50 (March 26, 2007); *State v. Brooks*, No. W2004–02834–CCA–R3–CD (Tenn. Crim. App. August 31, 2006) (unpublished order), *leave to appeal granted* (January 26, 2007); *People v. Bauder*, 269 Mich. App. 174, 184-85, 712 N.W.2d 506, 513-14 (2005); *State v. Moore*, 117 P.3d 1 (Colo. App. 2004); *Commonwealth v. Salaam*, 65 Va. Cir. 405 (2004). *Giles* is representative of the above-authority in noting that *Reynolds* "did not suggest that the rule's applicability hinged on [the defendant's] purpose or motivation in committing the wrongful act." *Giles*, slip op. at 8.

The plurality vigorously argues that the federal rule codified the common law rule in all respects, thereby settling the question of whether intent is always required in every case. For this proposition, the plurality relies upon language from *Davis v. Washington*, 547 U.S. ___, ___, 165 L. Ed. 2d 224, 244, 126 S. Ct. 2266, 2280 (2006), where the Court stated in passing that it was taking "no position on the standards necessary to establish *** forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard."

The language relied upon by the plurality is clearly *dicta* in so far as it can be claimed to support a requirement of intent. *Davis* did not in any way purport to settle the question of whether intent is required when it is the assault or murder of the witness that causes the witness's unavailability. It was not even argued in *Davis* that the witness was unavailable due to any specific conduct on the part of the defendant. Nor was it argued that the witness was unavailable as a result of a direct assault or murder of the victim. Rather, the government, joined by various *amici*, made only a general argument that domestic violence cases require greater flexibility in the use of testimonial statements because the crime is "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial." *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 244, 126 S. Ct. at 2279-80. It was in responding to this general argument that the

Court noted that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. There is nothing remarkable about this statement given the context in which it was made and that all prior precedent is in agreement.[4] Thus, *Davis* does not "strongly connote" a requirement of intent, as the plurality claims, when it is the assault or murder of the witness that directly causes the witness' unavailability. See slip op. at 20.

The plurality leaves out from its block quote of *Davis* (see slip op. at 19) the rest of the paragraph it is quoting from, which goes on to state: "We reiterate what we said in *Crawford*: that 'the rule of forfeiture by wrongdoing ... extinguishes confrontation claims on essentially equitable grounds.' [Citation.] That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280. The plurality does note this principle at the beginning of its analysis, but then abandons it. Unfortunately, the language the plurality abandons is the core principle on which the forfeiture-by-wrongdoing doctrine rests. That it encompasses the more narrower concern of witness intimidation does not negate its broader application.

Cases that have been decided after *Davis* do not interpret its language the same way that the plurality does. Recent cases have held that *Davis* does not impose a requirement that a defendant intend to prevent a witness from testifying in every case before the common law forfeiture doctrine may be applied. *Giles*, slip op. at 8, 18 (*Davis* reaffirmed the equitable nature of the forfeiture doctrine and does not require an intent requirement in nonwitness-tampering cases); *United*

---

[4]The Supreme Court of California in *Giles* recently considered this language from *Davis* and concluded that it "only describes the traditional form of witness tampering cases–in the context of the domestic violence cases therein where the victims did not testify at trial–without limiting the forfeiture doctrine to witness tampering cases. More important, *Davis* reaffirmed the equitable nature of the forfeiture by wrongdoing doctrine and declared that *Crawford*, in overruling *Roberts*, *supra*, 448 U.S. 56, did not destroy the ability of courts to protect the integrity of their proceedings. (*Davis*, *supra*, 126 S. Ct. at p. 2280.)" *Giles*, slip op. at 19 n.5.

*States v. Natson*, 444 F. Supp. 2d 1296 (M.D. Ga. 2006) (the common law forfeiture doctrine is broader than the federal hearsay exception, as it provides that a defendant who eliminates a witness forfeits any constitutional right to confront that witness regardless of defendant's motive); *People v. Vasquez*, No. 04CA0729 (Colo. App. November 30, 2006) (neither *Davis* nor *Reynolds* impose a requirement of intent under the common law forfeiture by wrongdoing doctrine adopted by *Crawford*); *State v. Brooks*, No. W2004–02834–CCA–R3–CD (Tenn. Crim. App. August 31, 2006) (unpublished order) (unlike the statutory hearsay exception, the common law forfeiture by wrongdoing doctrine is applied regardless of defendant's intent in committing a homicide), *leave to appeal granted* (Jan. 26, 2007); *Grayson v. Carey*, No. 2:03–cv–1694–MCE–KJM, slip op. at 2, 18-19 (E.D. Cal. August 10, 2006) (once a court has found as a preliminary matter that the defendant's conduct caused the witness' absence, the *Reynolds* court would recognize that there is no error in admitting the absent witness' testimony even where the defendant argues that his assault of the victim was without "premeditation or malice"). Given that the use of the word "codifies" in *Davis* was obviously *dicta* and that it was not written to address any argument about an "intent" requirement, it is not surprising that these five post-*Davis* cases did not find the language significant or even feel the need to mention it when discussing *Davis*.

The plurality acknowledges that the vast majority of courts hold intent irrelevant when it is the murder of the witness that causes the witnesses unavailability and the defendant is on trial for that very murder. The plurality claims that these cases are distinguishable because they all predate *Davis*. But *Giles*, *Natson*, *Vasquez*, *Brooks* and *Grayson*–all holding intent irrelevant–were all decided after *Davis*.

The plurality also claims that the present case is distinguishable because the witness was not murdered, but only assaulted, and murder is different because "a defendant knows with absolute certainty that a murder victim will not be able to testify" and intent can therefore be presumed. See slip op. at 24. The plurality cites no authority for this proposition, probably because it makes no sense. Many times the conduct that leads to a homicide is committed without an "absolute certainty" that the conduct will result in death, yet alone that it will result in the would-be witness being unable to testify. It is disturbing

that under the plurality's approach, if a defendant assaulted a victim by hitting him over the head and the victim subsequently died from his injuries, statements made by the victim before he died would be admissible at the murder trial. But if instead of dying the same victim went into a coma and remained permanently on life support, any statements made before the victim went into the coma would not be admissible at a trial for battery or attempted murder. Additionally, the plurality's argument on this point is inconsistent with its claim that the federal rule of evidence "codified" the common law doctrine.

The plurality also emphasizes that most, if not all, of the cases to hold intent irrelevant involved the death of the victim. But this is obviously because it is a much rarer case for the victim to somehow survive a defendant's attack and yet be unavailable to testify within the meaning of the sixth amendment. Wisely, the chief authority I discuss above does not limit the forfeiture rule's application to cases involving the death or murder of the victim. See *United States v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005) (defendant's wrongdoing must merely prevent the witness' unavailability); *People v. Giles*, slip op. at 25 (the rule applies when the witness is "genuinely unavailable to testify" and "the unavailability is caused by the defendant's intentional criminal act").

Aside from domestic violence cases, most crime victims that are not killed would want to testify against their assailants, provided they are left physically and mentally capable of doing so. Domestic violence cases are different, however, because those cases have a low victim-cooperation rate, which is usually due to either a general fear of the defendant or some remaining partiality on the victim's part toward the defendant. It is not that the assault itself has left the victim physically or mentally incapacitated. In sum, there is often an insufficient causal connection between the wrongdoing and the unavailability for application of the forfeiture doctrine in domestic violence cases absent a showing that the defendant intended to prevent the witness from testifying in connection with his conduct. It is also questionable whether a domestic violence victim who simply refuses to testify without any reason offered by the State is truly "unavailable" within the meaning of the confrontation clause. For all of these reasons, it is not surprising that the cases that find intent irrelevant usually involve the murder of the victim.

In a footnote, the plurality does cite one nonhomicide case where the forfeiture doctrine was at issue–*State v. Henderson*, 35 Kan. App. 2d 241, 253, 129 P.3d 646, 654 (2006), *leave to appeal granted*, No. 92251 (September 19, 2006)–a child sex abuse case where the court required intent. See slip op. at 23 n.2. But *Henderson* is easily distinguishable from the situation before us. The child in *Henderson* was unavailable solely because of her age–she was only three years old and was unable to understand the proceedings, the questions asked, and her duty to testify truthfully. Unlike the present case, there was no causal connection established between the defendant's assault and the witness' unavailability. See *Henderson*, 35 Kan. App. 2d at 253-54, 129 P.3d at 655 (the court noted that "[c]ausation between the action of the defendant and the witness' absence appears key" and the State did not cite any authority showing that the doctrine of forfeiture had been applied solely due to age). Thus, *Henderson* is actually consistent with my argument.

The plurality cites *People v. Melchor*, 362 Ill. App. 3d 335, 351 (2005), *appeal allowed*, 218 Ill. 2d 551 (2006) (table), to imply that it might support a rule that does not require "intent" if the defendant's wrongdoing results in the death of the victim. *Melchor* noted in *dicta* that a defendant on trial for the actual murder of the witness whose out-of-court testimony the prosecution wishes to present should clearly not be allowed to escape the forfeiture-by-wrongdoing doctrine based on his lack of a motive to prevent testimony when he killed the victim. *Melchor* observed that "[s]uch a rule is certainly logical; otherwise, defendants would be able to profit from their own wrongdoing. ' "[W]hen confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived." ' " *Melchor*, 362 Ill. App. 3d at 351, quoting *Devonshire v. United States*, 691 A.2d 165, 168 (D.C. App. 1997). *Melchor* went on to state that this exception to the intent requirement should only be applied in the situation described above and not where the defendant is "not on trial for killing the individual whose testimony the prosecution sought to admit." *Melchor*, 362 Ill. App. 3d at 351.

There is no principled basis, however, for distinguishing between situations where the witness is unavailable because of a murder committed by a defendant from situations where the witness is unavailable because of an assault committed by a defendant. A

witness can be just as unavailable to testify regardless of whether a defendant's assault leaves the witness dead, or in a comatose state on life support, or in some way mentally or emotionally incapable of testifying. See *Parrot v. Wilson*, 707 F.2d 1262 (11th Cir. 1983) (witness suffering from mental condition was properly declared unavailable where it was unlikely her condition would improve in the next six months).

The key inquiry should be on whether or not it is the defendant's wrongdoing that has prevented the witness from testifying when it is the defendant's assault or murder of the would-be witness that causes her unavailability. The equitable doctrine of forfeiture by wrongdoing simply does not allow a defendant to profit from wrongdoing that prevents a witness' testimony in such a case, and this is true regardless of motive and regardless of whether the victim is left dead or alive. All that should be required is a direct causal connection between the wrongdoing (the assault) and the unavailability. The plurality's contrary approach in requiring a specific intent to prevent testimony when committing the crime allows a defendant to convert a constitutional shield into a sword.

The two federal cases cited by the plurality are not helpful to its position. See *Steele*, 684 F.2d at 1202; *United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002). *Steele*, discussed above, noted the dual purposes of the common law doctrine in a case where a defendant purposely intimidated a witness, so the court did not have occasion to address whether intent was required for application of the doctrine.

*Thompson* is also inapplicable. There, the court never addressed the common law doctrine of forfeiture by wrongdoing. Instead, the court only entertained the government's limited argument based on Federal Rule of Evidence 804(b)(6), which by its plain language requires intent. See *Thompson*, 286 F.3d at 961-62. Furthermore, *Thompson* was decided over two years before *Crawford* "accepted" the common law doctrine and noted that the sixth amendment right does not depend on "the vagaries of the rules of evidence." *Crawford*, 541 U.S. at 61, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370.

For similar reasons, the two out-of-state cases relied upon by the plurality–*Commonwealth v. Edwards*, 444 Mass. 526, 830 N.E.2d 158 (2005), and *State v. Alvarez-Lopez*, 136 N.M. 309, 98 P.3d 699 (2004)–also do not support its position. In *Edwards*, the Massachusetts Supreme Court held that when a defendant colludes

with a witness to procure the witness' unavailability, the defendant forfeits his confrontation rights the same as if he had intimidated the witness. *Edwards*, 444 Mass. at 539-40, 830 N.E.2d at 170. The court did not consider whether a defendant must intend to prevent a witness from testifying when it is the assault or murder of the victim that renders the victim unavailable to testify. In *Alvarez-Lopez*, the New Mexico Supreme Court considered the forfeiture doctrine only in the context of Federal Rule of Evidence 804(b)(6). *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. Moreover, the situation there is easily distinguishable because it did not involve an assault or murder of the victim, but instead the "wrongdoing" at issue was that the defendant made himself a fugitive from justice for seven years. Thus, the court found that there was a lack of a sufficient causal connection between the defendant's "wrongdoing" and the witness' unavailability. *Alvarez-Lopez*, 136 N.M. at 314, 98 P.3d at 704. A lack of a causal connection is not an issue, however, where it is the defendant's direct assault or murder of the witness that causes the unavailability.

Some might suggest that if forfeiture by wrongdoing is applied to cases where the defendant is on trial for the very crime that has rendered the witness unavailable, the trial court will be required to essentially conclude, as a predicate for admissibility of the evidence, that the defendant is guilty of the very crime with which he is accused. The supreme courts of the states of California and Kansas have recently rejected this precise argument. See *People v. Giles*, No. S129852 (March 5, 2007); *State v. Meeks*, 277 Kan. 609, 615, 88 P.3d 789, 794 (2004). This so-called "bootstrapping problem" does not undermine the equitable reasons for the forfeiture doctrine, does not present the trial court with any undue procedural difficulty, nor does it preclude it from determining the preliminary facts necessary for an evidentiary ruling merely because they coincide with an ultimate issue in the case. See *Giles*, slip op. at 22. A court can determine forfeiture as a preliminary factual issue as it would with any other hearsay statement, and assuming the grounds for forfeiture have been proven by a preponderance of the evidence, the court will admit the evidence. *Giles*, slip op. at 22. This ruling will not infringe in any way upon the ultimate question for the jury's resolution–whether the defendant is guilty beyond a reasonable doubt of the crime charged. *Giles*, slip op. at 22. I agree with the *Meeks* and *Giles* courts' assessments and would adopt their analyses.

For all of the above reasons, I would remand for an evidentiary hearing on the forfeiture question, but I would not limit it to a determination of whether defendant threatened the victim into not testifying, as the plurality does. Instead, I would have the inquiry center on whether the witness was unavailable due to defendant's wrongdoing. Here, the record is replete with facts indicating a causal connection between defendant's wrongdoing and the unavailability of the witness. Dr. Machonkin testified that the victim of tender age was psychologically traumatized because of the assault, that her symptoms would reemerge if she should be called to testify, and that in the doctor's expert opinion, the victim was legally unavailable to testify. Under these facts, whether defendant forfeited his confrontation rights with respect to the victim's statements because of his own wrongdoing should be a factual question to be determined by the trial court in the first instance.

Having explained how I would resolve the forfeiture-by-wrongdoing issue differently than the plurality, I further note that I would not have addressed the issue in the first place because I would have found that the admissions of the child's statements to Grote and Yates were harmless. Thus, I would affirm defendant's conviction without any remand for further proceedings or a new trial.

## II. Harmless Error

The plurality acknowledges that *Crawford* violations are subject to a harmless error analysis and that the test to be applied is "whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." Slip op. at 47. This court has identified three approaches for measuring error under that test, which are as follows: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the improperly admitted evidence was merely cumulative or duplicates properly admitted evidence. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005), citing *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). The plurality believes that the evidence was close and that it could not decide beyond a reasonable doubt that the improper evidence did not contribute to the verdict. But I believe that the opposite conclusion is apparent when considering the other evidence that was properly admissible.

The plurality concludes, as I do, that the child's statement to her mother on the way to the hospital was correctly admitted. See slip op. at 44-45. With respect to that statement, the mother testified that she held her daughter close in the backseat of the car and asked her what had happened. The child responded that she and "Robert Stechly" were laying in bed and had taken a nap. The child then described an incident of sexual abuse committed by defendant against her, stating that "there was white stuff coming out of his pee pee," and that he pushed her head down to make her taste it. The child also told her mother that defendant said that if she told about the incident, he would hurt her. Thus, it is not surprising that the child spoke quietly enough so that the conversation was not heard in the front seat of the car. The other statements to Grote and Yates were essentially cumulative of the one to the mother.

The plurality's fixation on the fact that the child did not refer to defendant by his full name to babysitter Galete attempts to obfuscate that the child *did* clearly identify her assailant to her mother. The plurality's argument on this point is inconsistent. On the one hand, the plurality is trying to emphasize that there are other people named Bob in the child's life, but then when the child specifically identifies a particular Bob, the plurality wants to discredit that identification by claiming that it is "not logical" for the child to identify her assailant by his full name to someone she knows. I fail to see the logic in the plurality's argument. But more importantly, the plurality does not persuasively explain why defendant's confession does not clear up any possible doubt.

The plurality admits the strong similarity between the properly allowed statements to the mother and Galete and the improperly admitted statements to Grote and Yates, but in an odd non sequitur concludes that the similarity renders the statements noncumulative. See slip op. at 47. It claims that a new trial is warranted because the similarity of the statements served to strongly reinforce their believability. Slip op. at 51.

The plurality's conclusion is peculiar because it completely ignores that the believability of the child's statement to her mother was strongly reinforced by other competent testimony and evidence presented in the case. The plurality seems to be creating a new harmless error standard that holds that if some compelling additional evidence of defendant's guilt is thrown out, a defendant is entitled to

have his conviction reversed even if the remaining evidence is overwhelming and the discarded evidence is cumulative. This, of course, is not and should not be the law.

Turning to the other compelling and properly admitted evidence in the case in addition to the child's statement to the mother, I note that defendant himself presented the testimony of Brenda Galete, the child's babysitter during the relevant period. Her testimony corroborated the testimony of the mother, and certainly reinforced the believability of the child's statements. On cross-examination, Galete testified that on January 13, 1999, she had a conversation with the child in which the child told her that "Bob" had "pushed her head down on his penis and made her lick stuff from his penis and that it was sour and bitter." The child did not like the taste of it so she washed her mouth out. The child also said that she was afraid and repeatedly said that she did not want to do it. Galete then relayed all this information to police investigator Radz. Galete further testified that the child did not specify which "Bob" had abused her. Finally, Galete noted that two years had now passed since her conversation with the child and with investigator Radz, and Galete could not now remember whether she had told the investigator whether or not the "Bob" the child referred to was the mother's boyfriend. Radz, however, testified that Galete had told him that the "Bob" the child referred to was the mother's boyfriend. It was undisputed that defendant was the mother's boyfriend at the relevant time.

The plurality acknowledges that the child's description of the crime to babysitter Galete was very similar to what the child told her mother, which was also very similar to the details confessed to by defendant. But the plurality ignores this great similarity by venturing off to remark that there was "a reason that Galete was a witness for the defense, rather than for the prosecution." Slip op. at 48. I agree that there was a reason Galete was called as a witness for the defense. But that reason is not the one the plurality implies. Galete was called by the defense because she was unsure whether the child's reference to "Bob" as her abuser referred to defendant. Even though Galete's testimony favored the prosecution in light of the whole record, defendant took the chance of calling her in hopes of supporting his incredible trial testimony that he only confessed to the crime in accurate detail because he thought the police would discover the real truth later. Defendant's detailed confession to the serious and

embarrassing conduct involved here is enough to dispel all doubts that defendant was the "Bob" the child identified.

The plurality adopts defendant's argument that there was some confusion over whether defendant was the "Bob" referred to in the child's statements. But I believe that defendant's written confession to police, which was properly admitted, dispels beyond a reasonable doubt any possible confusion about whether defendant was the perpetrator of the crime. Before making oral and written confessions to the police that acknowledged sexual contact with the child, defendant was informed of his *Miranda* rights several times, which included the following warning: "*What you say can and will be used against you in a court of law*." See *Miranda v. Arizona*, 384 U.S. 436, 469, 16 L. Ed. 2d 694, 720-21, 86 S. Ct. 1602, 1625 (1966) (the right to remain silent must be accompanied by the explanation that "anything said can and will be used against the individual in court"). Defendant testified that he understood the rights explained to him and that he voluntarily gave his written confession. This is not a case where defendant challenged his confession as involuntary. Before giving his written confession, defendant broke down and wept and acknowledged that he sexually assaulted the child. Defendant's written statement then recounted an incident of oral sex with the child, but outrageously claimed that it was instigated by the child after they awoke from a nap. He admitted, however, that he told the child that she could lick his penis. Defendant further claimed that he told the child to get defendant's penis out of her mouth when he realized that it was the child and not her mother. He then took the child to the washroom and made her use mouthwash to get "the stuff" out of her mouth.

By the time of trial, defendant changed his story to deny any sexual contact and claimed that he only confessed because he was tired, wanted to go home, and figured the police would discover the real truth later. This trial testimony, however, was impeached by a sworn statement defendant made in court on February 1, 2000, in which he stated that everything in his written confession to police was true and that that was why he signed it. Defendant's new story at trial was also of course impeached by defendant's knowledge at the time he made his confession that anything he said to police would be used against him in court. Given the testimony of the mother, babysitter Galete and the defendant's own confession, I see no basis for the

plurality's failure to conclude that the error in the admission of the statements to Grote and Yates was anything other than harmless beyond a reasonable doubt.

The plurality attempts to cast doubt on defendant's detailed confession (and also apparently defendant's later swearing in open court that his confession was true) by citing defense counsel's comment that defendant suffered from a "mental disability" and therefore could not understand his *Miranda* rights. See slip op. at 50. There are three problems with this point. First, it is beyond dispute that arguments of counsel are not evidence and should not be considered as such. Second, the plurality's argument does nothing to explain why defendant's ratification of his confession in open court was not legitimate. And third, the evidence at trial did not support defense counsel's argument that defendant could not understand his *Miranda* rights because of cognitive difficulties.

Defendant himself admitted he could read. Defendant's own expert testified that defendant had average grades in school, and while an adult took truck-driving classes, graduating with excellent grades. There were two court-appointed experts, and they both testified on behalf of the State that defendant had the ability to understand and waive *Miranda* rights. One of the experts administered an IQ test where defendant scored only slightly below average and nothing indicated that defendant's written or verbal skills were impaired. Moreover, one of the court-appointed experts also testified that defendant's confession in blaming the victim and presenting a fantastic explanation was classic pedophile behavior.

Even though the excluded evidence was merely cumulative of the properly admitted evidence and the properly admitted evidence was overwhelming, the plurality flails at the air to come up with some reason why the improper evidence should not be considered cumulative and why the proper evidence should not be considered overwhelming. It points to the fact that some of the improper evidence included demonstrations with dolls and that one of the victim's recollections was in response to the question, "Can you tell me about Robert Stechly?" But even if this evidence could be viewed as adding additional strength to the State's case, it does not mean that this court should deem it as "contributing to the finding" for purposes of a harmless error analysis. Under the plurality's approach, a new trial would be warranted whenever evidence that is additionally

damaging to the defense is excluded no matter the overwhelming nature of the remaining evidence.

Finally, the plurality attempts to justify its reversal based on the circumstance that the first trial in this case ended in a mistrial. However, the second trial was conducted by way of a stipulated bench trial, and there is no indication at all that the trial court had any trouble concluding that defendant was guilty beyond a reasonable doubt. Furthermore, as our recent decision in *People v. Nitz*, 219 Ill. 2d 400, 413-14 (2006), makes clear, in deciding questions of plain or harmless error, we do not look to the actual jurors and their subjective mind-sets, but rather we are to look objectively at what a rational trier of fact would do when confronted with the properly admitted evidence. Thus, the fact that a mistrial was declared because some other jury or fact finder in a different proceeding could not agree on a verdict is completely irrelevant to our harmless error analysis. The plurality's consideration of the subjective mind-set of a previous trier of fact amounts to an abandonment of its responsibility to look at the evidence objectively.

While a reviewing court in making its harmless error determination should not become a "second jury" to determine whether a defendant is "guilty," a court should ask in a typical appellate-court fashion, "whether the record contains evidence that could rationally lead to a contrary finding." *Neder v. United States*, 527 U.S. 1, 19, 144 L. Ed. 2d 35, 53, 119 S. Ct. 1827, 1839 (1999). An otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 89 L. Ed. 2d 674, 684, 106 S. Ct. 1431, 1436 (1986). Given the two properly admitted, almost identical statements of the child, along with defendant's detailed confession and his admission in open court that the confession was true, added with defendant's improbable explanation for having confessed to a serious–and certainly embarrassing–felony offense, I believe that the error was harmless.

Because the properly admitted evidence was overwhelming, it is not significant that the trial court considered the cumulative statements to Grote and Yates as competent evidence. The child's properly admitted statements to her mother and Galete, along with defendant's confession, cleared up any doubt that he committed the

crime. Thus, I fail to see why the admission of the statements to Grote and Yates should not be deemed harmless error under an objective analysis of the properly admitted evidence.

JUSTICE KARMEIER joins in this dissent.

JUSTICE GARMAN, also dissenting:

I join in Chief Justice Thomas' dissent with respect to his harmless error analysis. I do not, however, join in his analysis of the forfeiture-by-wrongdoing issue. In my view, the admissible evidence was sufficient to support defendant's convictions. Accordingly, it is unnecessary to address any of the other issues raised in this appeal.